UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

HOWARD TAFLER,                    )

    Plaintiff,                    )

v.                               ) CIVIL ACTION NO.:

DISTRICT OF COLUMBIA, et al.,) 05-1563 (PLF)


    Defendants.                    )

           ----------------------

        Deposition of HOWARD TAFLER, taken on

Monday, May 21, 2007 at 9:36 a.m., at the

offices of the Attorney General for the

District of Columbia, 441 4th Street, Sixth

Floor, Washington, D.C., before E. Marsellas

Coates, Notary Public.

           --------------------

Reported by:

E. Marsellas Coates

1 APPEARANCES:

2

3         JUDE C. IWEANOGE, ESQUIRE

4         THE IWEANOGES' FIRM

5         1026 Monroe Street, N.E.

6         Washington, D.C.  20017

7         (202) 347-7026

8             On Behalf of the Plaintiff

9

10        SHANA L. FROST, ESQUIRE

11        OFFICE OF ATTORNEY GENERAL FOR THE

12        DISTRICT OF COLUMBIA

13        One Judiciary Square

14        441 4th Street, N.W.

15        Sixth Floor

16        Washington, D.C.  20001

17        (202) 727-6646

18            On Behalf of the Defendants

19

20

21

1 of that nature?

2      A.   Yes.

3      Q.   Okay.  So that specific night that you

4 were arrested, I understand that you called home

5 on your way from work; is that correct?

6      A.   I did.

7      Q.   Okay.  And what happened when you called

8 home?

9      A.   A guy answered the phone.  And I thought

10 it was her old boyfriend, which his name was

11 Josh.

12      Q.   What made you think it was her old

13 boyfriend?

14      A.   Because she had been hanging out with

15 him lately.  And about two weeks prior to the

16 incident, I had caught them both half dressed and

17 passed out in my apartment that I shared with

18 Jen, who was my girlfriend.  So I thought they

19 were still hanging out.

20          But the interesting thing is, when I

21 called home -- I didn't have my own phone and I

Page 35

1 called -- I used somebody else's phone and --

2       Q.   Someone else's cell phone?

3       A.   Somebody else's cell phone.  And her

4 number is (202) -- whatever her number is -- was.

5 The phone that I used to call was a (703) cell

6 phone.  So when I dialed it straight -- I didn't

7 dial (202), I just did 255, the seven digit

8 number, it went to a (703) number that was

9 similar to her's and a guy did answer the phone.

10 That's what caused the confusion.

11       Q.   So it was basically a misunderstanding?

12       A.   Basically.

13       Q.   So you had borrowed a friend's phone?  I

14 just want to make sure --

15       A.   It wasn't -- no -- it wasn't a friend.

16 There were two -- two people.  One of whom was a

17 friend, I asked him if I could use his phone.

18 And his friend had a phone, and I used his

19 friend's phone.

20       Q.   So it was a friend of a friend?

21       A.   A friend of a friend's phone.

Page 36

1      Q.   Okay.

2      A.   And I had -- I had just left work at

3 Equinox.  It was at night -- it was a night

4 shift.  And they gave me a ride halfway back to

5 my house.  And when we got out of the car, I -- I

6 decided to call home to say that -- that I was on

7 my way.  So it wasn't my phone it was somebody

8 else's Virginia cell phone.

9           And when I called her number with that

10 phone it called a Virginia number that was

11 similar to her's.  And a guy answered the phone

12 and I thought it was her ex-boyfriend, who she

13 had recently been hanging out with.

14     Q.   And then did you then make another call

15 to Ms. Andrews after that?

16     A.   I did.

17     Q.   Did you use the same phone?

18     A.   No.  I used a different phone.

19     Q.   Okay.  What phone did you use that time?

20     A.   I used somebody's phone that I knew.

21 The same -- part one of two people in that group.

1      Q.  So your friend's phone?

2      A.  My friend's phone.  Who that friend was

3 right now, I don't remember.  But I wanted to

4 call from a different number so she wouldn't

5 recognize it as being the came call, and -- or

6 the same caller.  And she answered the phone and

7 said that she had -- something about -- she said

8 that maybe I dialed the wrong number, which was

9 easy for me to figure out if I dialed the right

10 number or wrong number.  I just dialed the

11 original phone that I had made the first phone

12 call and I looked to see what number was the last

13 dialed, and there it was.  It was her phone

14 number.  I did not dial the wrong number, I

15 dialed the correct number.  And she swore that I

16 dialed the wrong number, and she didn't know what

17 I was talking about.  So I said I'll be home in 5

18 minutes.

19      Q.  That's all you said, I'll be home in 5

20 minutes?

21      A.  I -- what I said was that, if that guy

Page 38

1 Josh is there, he'd better not be there when I

2 get home, basically, unless he wanted to fight.

3 Because I was not happy about the first incident

4 when I caught them half naked, which I didn't do

5 nothing about.  I didn't fight anybody.  But I

6 didn't want him to continue to be having sex with

7 girlfriend in my apartment when I'm not there.

8          And I said, I suggest he's not there

9 when I got back there in 5 minutes.

10    Q.  Okay.  This first incident that you

11 found them together, you said they were both half

12 naked and passed out?

13    A.  Yes.

14    Q.  Okay.  Where did you find them in the

15 apartment?

16    A.  On our living room couch.

17    Q.  And when you say half naked, could you

18 be more specific, what clothes were they wearing?

19    A.  His shirt was off and his pants were

20 unbuttoned.  Her top was on, but her pants were

21 off.

1    Q.  And about what time of day was that?

2    A.  2 in the morning.

3    Q.  Okay.  And what did you do when you saw

4 them there?

5    A.  I just sat there and just looked in

6 disbelief, that I can't believe this guy's been

7 -- and my girlfriend are sitting naked on my

8 couch together.

9        The apartment was real small.  So I

10 didn't know what to do.  Should I make wake them?

11 I ended up not doing anything.  And so I guess I

12 made some noise or something like that, and my

13 girlfriend woke up on her own and got dressed.

14    Q.  Did you say anything to her at that

15 time?

16    A.  I don't know what exactly I said, but it

17 was pretty much, what the hell is this?  What's

18 going on here?  Why is everybody half naked.

19    Q.  What did she say to you?

20    A.  I don't remember.

21    Q.  Did you talk about it again after

1 street?  North side would be going up the hill.

2      A.  That -- that's on the north.

3      Q.  Because you're saying when you're coming

4 up 18th Street.  I assume you were going north?

5      A.  Okay.  Yeah.

6      Q.  You're --

7      A.  You make a right on U.

8      Q.  Right.  And would it be on --

9      A.  On the right-hand south.

10      Q.  So it's on the south side of U Street?

11      A.  The south side of U Street, yeah.

12      Q.  So when you're walking up 18th Street to

13 go onto the alley behind your building, that

14 would be before you hit U Street?

15      A.  Correct.

16      Q.  Going on 18th?

17      A.  Correct.

18      Q.  Gotcha.  And you said you all regularly

19 entered through the rear?

20      A.  Always, both me and Jen.  Her restaurant

21 that she managed was right around the corner on

Page 59

1 18th Street.  And so when she left her work she

2 would walk a half a block north up 18th and go

3 right around into that alley and go into our back

4 entrance.  That was our common route.

5     Q.  Okay.  You then say, "upon finding no

6 one home, I exited through the rear entrance and

7 proceeded to walk down the alley that runs behind

8 my building that's adjacent to 18th Street, N.W.,

9 and runs parallel to U Street.".

10         Why did you leave your apartment?

11     A.  There was no one there.

12     Q.  Why is that -- why would having no one

13 in the apartment make you leave?

14     A.  I was going to go back to Grill 88,

15 since it's right around the corner, to see if she

16 was there.

17     Q.  So you were heading over to your

18 girlfriend's place of business then?

19     A.  Uh-huh.

20     Q.  Okay.  Then you say that you start and

21 perhaps 50 feet outside the building when you

Page 60

1 heard running footsteps.  And then you were

2 tackled?

3      A.  Correct.

4      Q.  Okay.  Can you describe the officer that

5 tackled you?

6      A.  My first description of him was, I saw

7 him walking away from me, but I -- I saw what he

8 was wearing.  I didn't know that he was an

9 officer.  He never identified himself as an

10 officer.  He was wearing plainclothes, but he was

11 easily recognizable, because it say Nautica on

12 back of his T-shirt, and I saw that as he was

13 walking away.

14      Q.  What color was the T-shirt?

15      A.  It was a light colored shirt.  It was

16 either gray or yellow.  I'm not quite sure, it

17 was a little -- it was dim.  But it had a big

18 Nautica emblem on the back, like a big N.

19      Q.  And you're sure that was a Nautical

20 emblem and not --

21      A.  Positive.

Page 92

1 it was urgent or not.

2          Alls I know is, when I was in the

3 holding cell with 50 other people who were there

4 for -- ranging from stabbing people -- I was the

5 only person that was bloodied up and had been

6 beaten up.  I mean, there was murderers and

7 people that had done horrible things to other

8 people, I had done nothing and I'm -- you know.

9      Q.   My question to you, though, is, are you

10 marked here as being a non-urgent patient?

11      A.   That's what it says.

12      Q.   Okay.  And it also indicate on that same

13 page -- no, I'm sorry -- actually the next page,

14 third page of that exhibit, No. 3, under the

15 psych column, there's a circle around the word

16 judgment.  And then it says inebriated, but

17 appropriate; is that correct?

18      A.   Where are you looking?

19      Q.   The third page, where judgment is

20 circled.  It says inebriated, but appropriate; is

21 that correct?

1      A.   That's what it says.  I wouldn't say

2 that I was inebriated, I had a drink.

3      Q.   So you would disagree with that

4 statement in the records, then?

5      A.   Absolutely.

6      Q.   Okay.  Above that it appears to say --

7 indicate that you've had a 1 to 2 centimeter

8 laceration, superficial, upper lip, and

9 approximately a 4 centimeter laceration on the

10 bottom of your chin actively bleeding; is that

11 correct?  Is it correct that it says that?

12           (Brief interruption.)

13      A.   I'm sorry, repeat the question.

14      Q.   Sure.  Right up here (indicating), it

15 indicates that you had is 1 to 2 centimeter

16 laceration, superficial, upper lip, and

17 approximately a 4 centimeter laceration on the

18 bottom of your chin, which is actively bleeding?

19      A.   Correct.

20      Q.   Okay.  Does that accurately describe the

21 injuries that you had?

Page 94

1      A.  Superficial upper lip, I don't know.  He

2 split my upper lip open, and there's other scars

3 that you can see (indicating).

4      Q.  Uh-huh.

5      A.  4 centimeter laceration at the bottom of

6 my jaw, is that what it says.

7      Q.  I think it says chin.

8      A.  Chin.  Yeah.  I mean you can see this

9 scaring here (indicating), and here (indicating).

10 It's like this was all ripped open.  I saw myself

11 in the reflection and there was meat hanging off

12 my face.

13      Q.  And you didn't lose consciousness that

14 night, correct?

15      A.  No.

16      Q.  And on the first page of Exhibit 3,

17 where it says discharge instruction -- the very

18 first page.

19      A.  (Witness complying.)

20      Q.  The instructions were the keep it clean

21 and dry, correct?

1      A.   Yes.

2      Q.   And you were prescribed Tylenol or

3 Motrin for the pain, correct?

4      A.   Correct.

5      Q.   Okay.  Does it say anywhere in the

6 medical records that you received 18 stitches?

7      A.   No, it doesn't.  Not to my knowledge.

8 By when I went to have go have my stitches

9 removed, the guy that put them in took them out.

10      Q.   And what doctor was that?

11      A.   It says here Dolin, if that's him.  I

12 had -- to my recollection it was 8 stitches

13 outside, and then they were an equal number or

14 more, like 8 to 10 -- he wasn't sure how many at

15 the time, because they were inside.  They were

16 dissolving stitches, so we left them in there.

17 He said that there was like 8 to 10 stitches

18 internally that dissolved, and there was about 8

19 on the outside that he removed.

20      Q.   Okay.  And did you happen to see

21 anything in these medical records that the flesh

Page 96

1 was ripped and hanging off your face?

2      A.  That's what it looked like to me.

3      Q.  But that's not indicated in with the

4 medical records, is it?

5      A.  If I was writing the record, that's how

6 I would -- I mean if she doesn't write it like

7 that then, you know, I guess everybody's

8 wording's a little different.  And if I saw

9 another person that looked like I did, I would

10 write it like that.

11           MS. FROST:  Can you mark this, please.

12           (Whereupon, Tafler Deposition Exhibit

13 No. 4, medical records, marked.)

14      Q.  Mr. Tafler, did you want to add

15 something?

16      A.  Yeah.  I'm noticing at the bottom here

17 it says Teresa Dolin.

18      Q.  And when you say here, you're talking

19 about Deposition Exhibit No. 3?

20      A.  Yes.  There was a guy who put the

21 stitches in and removed it.  I don't know who

Page 97

1 Teresa Dolin is.  Maybe she was the attending

2 doctor.

3          But as far as who put them in, who put

4 the stitches in and took them out, there was a

5 guy.

6     Q.  Do you know whether it was a doctor or a

7 nurse?

8     A.  Don't know.

9     Q.  Okay.  I'm showing you what's been

10 marked as Deposition Exhibit No. 4.  Do you

11 recognize this document as one being produced to

12 us?

13    A.  (Witness reviewing record.)  It's got my

14 name on it.  I haven't looked at thee medical

15 records in a while.  So, and it's hard to read

16 the writing.

17    Q.  It is.

18    A.  Suffered hip -- lip suture removal.

19 Yeah.

20    Q.  So this is from when you got the

21 stitches taken out, correct?

1         You know, considering the damage he did

2 the first time, which was pretty extensive, that

3 I managed to walk away from, I can't imagine what

4 he'd do to me the next time that I couldn't walk

5 away from.  You know, he knows the area that I

6 live in, and I don't see him coming when he

7 comes.  And, you know, what was I going to do,

8 file a complaint against him for threatening me

9 that if I ever filed another complaint against

10 him, that he'd make sure I wouldn't walk again.

11         I was scared to file a complaint -- I

12 would have been -- I would have loved to file

13 another complaint about him -- about that

14 specific threat.  And that actually became a very

15 big part of like the reason it took me so long to

16 file this case, was because I was scared that

17 that guy was going come after me if I filed this

18 case.  That's why we filed it three years to the

19 day.  I mean, I was thinking for years am I going

20 to file this, am I going to file this and I was

21 -- I was squared to.

1         And then it all came to a head on August

2 5th, again, 2007, with the roof incident.

3     Q.  5.

4     A.  2005.

5     Q.  We'll get to that.

6     A.  That guy is a bad -- this guy -- I

7 understand he's not an officer anymore and

8 probably for good reason, you know.  I know he's

9 got a right to counsel, but I mean, he's not --

10 he not good.

11     Q.  The -- the other officer, did he say

12 anything to you?

13     A.  No.

14     Q.  He just stood there?

15     A.  Uh-huh.

16     Q.  Did you get his name?

17     A.  No.

18     Q.  Okay.  And you said you had filed a

19 complaint against Hector?

20     A.  Yes.

21     Q.  When did you file the complaint?

1      A.   I filed a complained after the incident

2 on August 5th, 2002 or 4, or whatever it was that

3 you have.

4      Q.   How long after the incident?

5      A.   Shortly thereafter.  I mean, my public

6 defender who, you know, got me out of jail or

7 whatever, she was my -- I don't know if she got

8 me out or I just was released on my own

9 recognizance, whatever, she was handling my case.

10         They were appalled.  They couldn't

11 believe my face and stuff like that.  I think I

12 filed a complaint through them, with their

13 assistance.  They actually took a lot of these

14 pictures that I have here.  They couldn't

15 believe that he had done that to me.

16     Q.   So you yourself didn't file the

17 complaint?

18     A.   I mean I filed it.  I don't know if I

19 filed it through somebody.  I lodged the

20 complaint against him.

21     Q.   Did you write out a complaint?

1       A.  I don't know.  I know that I -- I know

2 that I made a complaint against them.

3       Q.  Okay.  I'm asking you.  You say you know

4 you made a complaint, I'm asking you how you made

5 the complaint?

6       A.  That I don't recall.

7       Q.  Do you know if it was an oral complaint,

8 a written complaint?

9       A.  It was a written complaint.  I don't --

10      Q.  Did you write out a complaint?

11      A.  That sounds about right.  I mean, how

12 else would you complain?

13      Q.  I'm asking you.  I don't have a copy of

14 your complaint, do you?

15      A.  No.  I don't have one.

16      Q.  Okay.  And what I'm trying to understand

17 is, you said you were working with a public

18 defender.  Did someone from the Public Defender's

19 Office write out a complaint and submit it to the

20 3rd District on your behalf?

21      A.  That's a good possibility.  I mean I

1 don't know if I wrote it and they just, you know,

2 filed it for me or if I filed it myself.  I'm

3 sure -- you know, there was paperwork involved.

4 I don't -- I don't recall the forms or if there

5 is a form or the number of the form, if there is

6 a form for that or, you know, the manner in which

7 it was filed.  I know that there was a formal

8 complaint file against him.

9      Q.  You can't say for sure whether you

10 actually wrote it out yourself?

11      A.  I'm su -- I mean, how else would it get

12 written?  I'm sure --

13      Q.  That's what I asking.  Because you're --

14 you're telling me you don't remember if you

15 actually wrote something out or if someone wrote

16 something out for you?

17      A.  No one would have written it for me.

18 Because it was by my own -- by my own -- you

19 know, it was my intent to file a complaint, I'm

20 sure I wrote it.

21      Q.  So you wrote the complaint, but you

Page 152

1 don't know how it got submitted?

2      A.   However these things get submitted.   I

3 don't -- I don't know the --

4      Q.   Well, did you walk down to the 3rd

5 District and submit a complaint?

6      A.   I don't remember.

7      Q.   Okay.   Do you remember going into the

8 Public Defender's Office and writing out and

9 signing a complaint?

10     A.   I remember at the time I was very close

11 with the Public Defender's Office, and they were

12 taking affidavits and stuff in regards to this.

13 And, you know, they were very helpful.   And they

14 helped me file things and took pictures and

15 helped me get done what I needed to get done in

16 time.   And actually supplied all the -- all the

17 documents or most of the documents that I have

18 for you.   They -- they retrieved them for me.

19 And made sure that I had everything in regards to

20 this case.

21     Q.   And so all documents that you've gotten

1 from the Public Defender you've handed over to

2 your lawyer?

3     A. Yeah.

4     Q. Okay. Do you recall whether there was a

5 copy of the complaint that you filed against

6 Officer Hector within those documents?

7     A. I don't recall.

8     Q. Okay. Is there anything that you can

9 think of that -- for you to verify that you filed

10 this complaint other than what's your own

11 testimony?

12    A. Is there anything that what?

13    Q. Anything, aside from your own testimony,

14 to verify that you filed this complaint?

15    A. The fact that he threatened me because I

16 filed the complaint. I think that's proof to me

17 that it was filed. Because, you know, I guess he

18 heard about it or something. I guess he wasn't

19 disciplined, because he was still wearing his

20 uniform.

21    Q. Were you ever contacted by the Office of

Page 154

1 Police Complaints regarding your complaint?

2      A.   I don't think so.

3      Q.   There was --

4      A.   I don't think I ever heard anything

5 about it.  I filed it and never heard nothing

6 about it.  Just like, boom, bye, it never

7 happened.

8      Q.   What address did you put on the

9 complaint?

10     A.   It was five years ago, I don't remember.

11     Q.   Is it possible that you put down an

12 address that you were no longer living at?

13     A.   No.

14     Q.   No?  No, that's not possible?

15     A.   Very doubtful.

16     Q.   But you had moved a few times since the

17 incident, correct?

18     A.   I had moved once, and I think -- I think

19 there was a forwarding address.

20     Q.   Okay.

21          (Break taken.)

1          BY MS. FROST:

2          Q.   Since the time that you saw officer

3    Hector on the street, on Euclid Street, did you

4    see Officer Hector any time thereafter?

5          A.   No.

6          Q.   And did you see Officer Hector any time

7    between the time of your arrest and the time that

8    you saw him on Euclid Street, that you know of?

9          A.   I mean I -- I can't quite say that I

10   didn't see him.   Okay.   Let me go back and

11   restate this.   I was very paranoid about him and

12   I had overwhel -- overwhelming fears that he was

13   like around me and lurking around the corner.

14   And I would hear him, you know.

15         Q.   But did you actually see him at any

16   time?

17         A.   The night that I fell off the roof I

18   thought I saw him.

19         Q.   And we are going to get to that.   But

20   I'm talking about the time between your arrest on

21   August 4th, 2002 and the time that you saw him,