## HOWARD TAFLER – MAY 21, 2007

HOWARD TAFLER
vs.
DISTRICT OF COLUMBIA, et al.

Page 1 to Page 236

Condensed Transcript and Concordance
Prepared By

*PRECISE REPORTING SERVICES*
8804 Sumner Grove Drive
Laurel, Maryland 20708
Phone (301) 210-5092
Toll Free (866) 847-3351
Fax (301) 210-5094
www.precisereportingservices.com



Precise Reporting Services
(301) 210-5092
Serving MD, D.C. & VA

DEPOSITION OF HOWARD TAFLER
Conducted on May 21, 2007

1

```
1         UNITED STATES DISTRICT COURT
2         FOR THE DISTRICT OF COLUMBIA
3    HOWARD TAFLER,           )
4       Plaintiff,            )
5    v.                       ) CIVIL ACTION NO.:
6    DISTRICT OF COLUMBIA, et al.,) 05-1563 (PLF)
7
8       Defendants.           )
9         -------------------
10        Deposition of HOWARD TAFLER, taken on
11   Monday, May 21, 2007 at 9:36 a.m., at the
12   offices of the Attorney General for the
13   District of Columbia, 441 4th Street, Sixth
14   Floor, Washington, D.C., before E. Marsellas
15   Coates, Notary Public.
16        -------------------
17   Reported by:
18   E. Marsellas Coates
19
20
21
```

2

```
1    APPEARANCES:
2
3       JUDE C. IWEANOGE, ESQUIRE
4       THE IWEANOGES' FIRM
5       1026 Monroe Street, N.E.
6       Washington, D.C.  20017
7       (202) 347-7026
8          On Behalf of the Plaintiff
9
10      SHANA L. FROST, ESQUIRE
11      OFFICE OF ATTORNEY GENERAL FOR THE
12      DISTRICT OF COLUMBIA
13      One Judiciary Square
14      441 4th Street, N.W.
15      Sixth Floor
16      Washington, D.C.  20001
17      (202) 727-6646
18         On Behalf of the Defendants
19
20
21
```

3

```
1            P R O C E E D I N G S
2            ---------------
3           HOWARD TAFLER,
4    being first duly sworn to tell the truth, the
5    whole truth, and nothing but the truth, testified
6    as follows:
7           EXAMINATION BY MS. FROST:
8       Q.  Good morning, Mr. Tafler.  We met
9    outside, but just for the record, my name is
10   Shana Frost.  I represent the District of
11   Columbia and Officer Anthony Hector in a lawsuit
12   that you filed against them.
13      A.  Okay.
14      Q.  And we're here today for your deposition
15   in that case.
16          Have you ever been deposed before?
17      A.  No.
18      Q.  Okay.  Well, let me just go over the
19   basic ground rules for a deposition.  It's very
20   important that all your answers be spoken.  The
21   court reporter, to your right, cannot take down a
```

4

```
1    nod of the head or a shake or anything like that.
2       A.  Okay.
3       Q.  And it's also important that we not
4    speak over each other.  If you'll wait until I've
5    completed my question before you answer, and I'll
6    wait until you're done before I speak again.
7    That makes the court reporter's job a lot easier
8    and the record a lot clearer.
9       A.  Okay.
10      Q.  Your testimony today is given under the
11   penalty of perjury, just as if you were in court.
12   You're under oath.
13          And if you need a break at any time,
14   just ask and I will do my best to accommodate
15   you.  And I think that's it.
16          Do you have any questions before we get
17   started?
18      A.  No.
19      Q.  Okay.  Are you currently taking any
20   medication?
21      A.  I take pain medication.
```

1 (Pages 1 to 4)

DEPOSITION OF HOWARD TAFLER
Conducted on May 21, 2007

41

1   10 minutes, I suggest he's not there what I get
2   there.
3        Q. So it's more of a warning to get him to
4   leave?
5        A. Pretty much.
6        Q. Did you threaten to hurt Ms. Andrews?
7        A. Never.
8        Q. At that night?
9        A. I've never threatened her.
10       Q. Okay. You said you were coming home
11   from work when this all happened?
12       A. Yes.
13       Q. And you had worked the night shift?
14       A. Uh-huh.
15       Q. Did you stop anywhere on your way home
16   from work?
17       A. A couple of guys that I worked with went
18   to some bar on Dupont Circle, and invited me to
19   have a drink with them before I went home, so.
20       Q. You don't remember the name of the bar?
21       A. I'm thinking maybe the Big Hunt, but I

42

1   don't know. It was a place that I'd never been
2   to before, and I haven't been back there since.
3        Q. And that was with a few people from
4   work, you said?
5        A. Two guys from work.
6        Q. Do you remember their names?
7        A. Unfortunately I don't.
8        Q. Okay. Do you know how many drinks you
9   had?
10       A. I had one. I was tired. I wasn't even
11   trying to go to the bar, I just wanted to go
12   home. And the only reason I went in there was
13   because they gave me a ride halfway home, and the
14   only reason I -- well, the only reason I was with
15   them was basically for the ride. So I wasn't
16   really trying to go out for the night, I just had
17   a drink.
18       Q. So basically you went to like a downtown
19   area of Dupont?
20       A. Adam's Morgan.
21       Q. And from Dupont you were able to go to

43

1   Adam's Morgan?
2        A. Yes.
3        Q. Had you had anything to drink before you
4   left work?
5        A. No.
6        Q. So this entire evening you only had one
7   drink?
8        A. I had one drink, yeah.
9        Q. Okay. So you hadn't been drinking while
10   working?
11       A. No.
12       Q. Had you been doing any drugs that
13   evening?
14       A. No.
15       Q. Were you doing drugs at the time?
16       A. Can you clarify that.
17       Q. Well, during the general period of
18   August 2002, were you at any time using drugs?
19       MR. IWEANOGE: Objection.
20       THE WITNESS: Do I have to answer that?
21       Q. Unless it's attorney/client privilege,

44

1   you have to.
2        MR. IWEANOGE: I don't think there
3   wasn't any charge to it. But in regards to
4   self-incrimination, that's why I'm -- you know,
5   I'm opposed to him answering specific questions
6   with regard to use of drugs or --
7        MS. FROST: Well, I understand that, but
8   there also has to be a reasonable fear of
9   prosecution. And I don't think you have that
10   here. Drug use is not a crime in the District of
11   Columbia.
12       MR. IWEANOGE: Okay. Go ahead and
13   answer.
14       A. I had used cocaine on occasion.
15       Q. And when you say on occasion, how often?
16       A. A couple times a week, probably.
17       Q. And how long had you been using cocaine,
18   a couple times a week?
19       A. I mean that's -- that's -- it wasn't
20   always -- you know, it wasn't a couple times a
21   week. I'd probably been doing it for about two

11 (Pages 41 to 44)

DEPOSITION OF HOWARD TAFLER
Conducted on May 21, 2007

49

1    A. She could probably put down 12 drinks.
2 Like liquor, shots, not beer, or more.
3    Q. And that was daily?
4    A. She probably had at least six drinks
5 daily, minimum. And you know she probably got
6 completely inobriated anywhere between three and
7 four nights a week. She'd probably drink
8 anywhere between 10 and 15 drinks, she would
9 really drink. I couldn't drink like that, I
10 never did. I couldn't keep up with her.
11    Q. Did she ever seek treatment for alcohol
12 abuse, to your knowledge?
13    A. No. Not that I know of.
14    Q. When you said she would occasionally
15 smoke pot --
16    A. On occasion.
17    Q. -- how often?
18    A. I don't know. I don't smoke pot, so I
19 wouldn't smoke it with her. Whoever she did it
20 with, she did it without me.
21    Q. Would you ever use drug together?

50

1    A. We drank together. We'd done a little
2 cocaine together.
3    Q. The night of incident, do you know if
4 she was drinking or using drugs that night?
5    A. I don't know. I wouldn't know I was at
6 work. So it's likely, though. I mean I couldn't
7 say for sure, but she drank. She managed a bar,
8 that was her job, and when she was behind the bar
9 she drank.
10    Q. What bar did she manage?
11    A. It's called Grill 88.
12    Q. When you spoke to her that night, did
13 she sound like she might be under the influence?
14    A. I couldn't really judge that over the
15 phone, if she sounded like she was under the
16 influence or not. You know, the conversation was
17 mainly about the guy that just answered her
18 phone. And she seemed a little confused about
19 it. And, in hindsight, I can understand why, I
20 was -- she was confused. Was she confused
21 because she was drunk? That's a possibility.

51

1 You know, if she sounded confused because she was
2 drinking, it's a possibility, but I couldn't say
3 for sure.
4    (Brief Interruption.)
5    Q. Have you ever studied Karate?
6    A. Have I ever studied Karate?
7    Q. Uh-huh.
8    A. Yes.
9    Q. Okay. And how long did you study
10 Karate?
11    A. A couple years.
12    Q. Was that here in Washington or in
13 Philadelphia or both?
14    A. I took -- yeah. I took classes in
15 Philadelphia. I took a course in college.
16    Q. Were you belted?
17    A. Yeah, I have a -- a green belt. It's
18 not very high up the chain.
19    Q. How high is that?
20    A. It's midway to black. A little less
21 than midway.

52

1    Q. How about Taekwondo?
2    A. That's actually -- I thought you were
3 being general. I was belted in Taekwondo.
4    Q. Okay. Is that a form of Karate, then?
5    A. I would have thought that you might
6 think so.
7    Q. Okay.
8    A. No. It's not a form of Karate.
9    Q. So you actually studied Taekwondo?
10    A. It's a different sport -- yeah. It's a
11 different sport.
12    Q. Okay. And around the time of the
13 incident, did you ever carry any sort of weapon
14 to protect yourself?
15    A. No.
16    Q. Is that a no?
17    A. No. I'm sorry, no.
18    Q. Okay. So did you -- you never carried a
19 knife?
20    A. No.
21    Q. Did you ever tell anyone that you

13 (Pages 49 to 52)

DEPOSITION OF HOWARD TAFLER
Conducted on May 21, 2007

53

1  carried a knife?
2      A.  No.  I never carried a knife.
3      Q.  And you never told anyone you carried a
4  knife?
5      A.  No.
6      Q.  Have you ever owned any type of a
7  firearm?
8      A.  No.
9      Q.  Have you ever carried a firearm?
10     A.  No.
11     Q.  On your way home from work that night,
12  did you make any other phone calls besides the
13  two to Ms. Andrews?
14     A.  No.
15     Q.  Let me --
16         MS. FROST:  Can you mark this, please.
17         (Whereupon, Tafler Deposition Exhibit
18  No. 1, answers to Interrogatories, marked.)
19     Q.  Mr. Tafler, I show you what's been
20  marked for identifications as Defendant Exhibit
21  No. 1.  Do you recognize this document?

54

1      A.  Yes.
2      Q.  And what is the document?
3      A.  It's my answers to your Interrogatories.
4      Q.  Turning to page 4, your response to No.
5  2, which was basically your narrative of the --
6  what you contend happened on the evening of
7  August 4, 2002, correct?
8      A.  Correct.
9      Q.  You say that you were on your way home
10  from work and called home to hear a mean answer
11  my girlfriend's mobile cell phone number.  I
12  thought this person was somebody that I knew and
13  didn't want in my apartment.
14         This is basically what we were talking
15  about earlier, correct?
16     A.  Yes.  Specifically his name is Josh.
17     Q.  Okay.  Earlier had Ms. Andrews asked you
18  to leave the apartment at any point during the
19  day?
20     A.  We were fighting earlier.
21     Q.  Okay.  What were you fighting about?

55

1      A.  I don't know, it was just nothing that
2  stands out in mind.  It was just some argument
3  that boyfriends and girlfriends do.  It's not a
4  big deal.
5      Q.  So just your general bickering?
6      A.  Bickering, yes.
7      Q.  But she hadn't asked you not to come
8  home, anything like that?
9      A.  I lived there.
10     Q.  So my question is, she hadn't thrown you
11  out or insinuate that she wanted you out?
12     A.  No.
13     Q.  Okay.  You then say, "I entered through
14  the rear entrance through my apartment's
15  personally gated yard and directly into my
16  apartment."
17         Did you use a key to get in?
18     A.  I had a key, yeah.
19     Q.  And you used the key to get in?
20     A.  Uh-huh.
21     Q.  You didn't try to kick in the back door?

56

1      A.  I -- you couldn't kick the back door in
2  if you tried, but I think I gave it a couple of
3  kicks so that whoever was in the apartment -- if
4  Josh was there -- would leave.  So that's when I
5  went in the apartment so he would not be in there
6  when I get in there.
7      Q.  So sort of like some warning noise?
8      A.  Yes.  Exactly.  I gave a warning noise
9  and I gave ample time to be out since the phone
10  call.  So it was a warning once, yes.
11     Q.  When you kicked at the door, did you do
12  any damage to it?
13     A.  No.
14     Q.  Can you describe what it looked like?
15  Was it glass, wood?
16     A.  It was wood.  It had a glass insert with
17  bars.
18     Q.  Was it -- were the bars exactly on the
19  door or they sort of like a -- a bared gate
20  before the door?
21     A.  Well, there was a patio that was

14 (Pages 53 to 56)

DEPOSITION OF HOWARD TAFLER
Conducted on May 21, 2007

57

1  enclosed, there was a wooden fence. And when you
2  entered our patio there was the door to our
3  bedroom, which was the way I always entered the
4  apartment coming up 18th Street. Because if I'm
5  walking around -- there's an alleyway behind my
6  apartment building. When you come up 18th Street
7  and you make a right into the alleyway, my
8  apartment's right back there.
9      Q. Okay.
10     A. On the ground level. Otherwise, the
11 alternative is to walk further up 18th Street,
12 kind of go up around U, go up the stairs. It's
13 -- the long way to get into our apartment is to
14 go in through the front door, right when -- we
15 were right on the ground in the alley, so it was
16 always the quicker way to go, is my --
17     Q. And so your apartment was on -- the
18 front door to your apartment was on U Street?
19     A. The front door to my apartment building
20 is on -- was on U Street.
21     Q. On the north or south side of the

58

1  street? North side would be going up the hill.
2      A. That -- that's on the north.
3      Q. Because you're saying when you're coming
4  up 18th Street. I assume you were going north?
5      A. Okay. Yeah.
6      Q. You're --
7      A. You make a right on U.
8      Q. Right. And would it be on --
9      A. On the right-hand south.
10     Q. So it's on the south side of U Street?
11     A. The south side of U Street, yeah.
12     Q. So when you're walking up 18th Street to
13 go onto the alley behind your building, that
14 would be before you hit U Street?
15     A. Correct.
16     Q. Going on 18th?
17     A. Correct.
18     Q. Gotcha. And you said you all regularly
19 entered through the rear?
20     A. Always, both me and Jen. Her restaurant
21 that she managed was right around the corner on

59

1  18th Street. And so when she left her work she
2  would walk a half a block north up 18th and go
3  right around into that alley and go into our back
4  entrance. That was our common route.
5      Q. Okay. You then say, "upon finding no
6  one home, I exited through the rear entrance and
7  proceeded to walk down the alley that runs behind
8  my building that's adjacent to 18th Street, N.W.,
9  and runs parallel to U Street.".
10     Why did you leave your apartment?
11     A. There was no one there.
12     Q. Why is that -- why would having no one
13 in the apartment make you leave?
14     A. I was going to go back to Grill 88,
15 since it's right around the corner, to see if she
16 was there.
17     Q. So you were heading over to your
18 girlfriend's place of business then?
19     A. Uh-huh.
20     Q. Okay. Then you say that you start and
21 perhaps 50 feet outside the building when you

60

1  heard running footsteps. And then you were
2  tackled?
3      A. Correct.
4      Q. Okay. Can you describe the officer that
5  tackled you?
6      A. My first description of him was, I saw
7  him walking away from me, but I -- I saw what he
8  was wearing. I didn't know that he was an
9  officer. He never identified himself as an
10 officer. He was wearing plainclothes, but he was
11 easily recognizable, because it say Nautica on
12 back of his T-shirt, and I saw that as he was
13 walking away.
14     Q. What color was the T-shirt?
15     A. It was a light colored shirt. It was
16 either gray or yellow. I'm not quite sure, it
17 was a little -- it was dim. But it had a big
18 Nautica emblem on the back, like a big N,
19     Q. And you're sure that was a Nautical
20 emblem and not --
21     A. Positive.

15 (Pages 57 to 60)

DEPOSITION OF HOWARD TAFLER
Conducted on May 21, 2007

61

1    Q.  Okay.  About how tall was he?
2    A.  About 5'10".
3    Q.  What type of build?
4    A.  Stocky.
5    Q.  White, black, hispanic?
6    A.  I couldn't figure out if he was white
7  and black mixed or hispanic.  I'm not quite sure.
8    Q.  How would you describe his skin tone?
9  Sort of a light-skinned black?
10    A.  Light-skinned -- light-skinned black or
11  maybe like olive.
12    Q.  Okay.  Later on in that response you
13  say, "Hector exits his vehicle -- actually let me
14  back up a second.  At what point did you identify
15  -- were you able to associate this man that you
16  said tackled you as Anthony Hector?
17    A.  He was the person who wrote up the
18  report.
19    Q.  Your arrest report?
20    A.  He was the arresting officer.  So that's
21  -- that's how I figured out who it was.

62

1    Q.  So his name was on the arrest report?
2    A.  Correct.
3    Q.  And when did you get a copy of the
4  arrest report?
5    A.  I think when I got out of jail.
6    Q.  Did you -- how did you get it, did you
7  ask for it at the police station?
8    A.  I had a public defender that assisted me
9  throughout the incident, and they were -- they
10  were helpful when I got out of jail.  And they
11  provided me with some paperwork and stuff that I
12  requested through them.
13    Q.  And how long after the night of the
14  arrest were you able to get a copy of the arrest
15  report?
16    A.  I was arrested on a Friday night and
17  released on Monday, so probably Monday.  That
18  would be the 8th of August --
19    Q.  And we'll go through that.
20    A.  -- perhaps.
21    Q.  So you saw Hector exit his vehicle,

63

1  which was parked a half block down the alley
2  behind me.  What type of car was this?
3    A.  It was -- I don't know -- a Caprice.  It
4  was a police vehicle.
5    Q.  Was it a squad car, a marked --
6    A.  It was -- it was parked further down, I
7  couldn't -- I didn't recognize it immediately as
8  a squad car until I saw him get out of the -- out
9  of the car.  When he -- when he opened the door,
10  I saw the markings on the side.  It was painted
11  on the side.
12    Q.  So it as your typical MPD police car?
13    A.  Yeah.
14    Q.  And lights on the top?
15    A.  (Witness nods head.)
16    Q.  And Metropolitan Police Department on
17  the side?
18    A.  I couldn't -- it was hard to see,
19  because he had his high beams on.
20    Q.  All right.
21    A.  So I couldn't really see that it was a

64

1  police car.  I mean, there was so much police
2  activity going on around me that it was -- that
3  at that point, you know, it was safe to assume
4  that it was a police car.  I didn't -- I didn't
5  know for sure until I saw the markings on the
6  side when he opened the door and stepped out and
7  came back over to me.
8    Q.  So the car that he was travelling in,
9  then, was a marked MPD police car?
10    A.  I suppose.  I never saw him travelling in
11  it.
12    Q.  Okay.  But you did see him get out of it
13  at some point?
14    A.  At the point after I was on the ground.
15  I didn't see him or his car up until that point,
16  so.
17    MS. FROST:  We need to take about a 20
18  minute break right now.
19    (Off the record.)
20    (Discussion off the record.)
21    THE WITNESS:  So I don't want to get

16 (Pages 61 to 64)

DEPOSITION OF HOWARD TAFLER
Conducted on May 21, 2007

65

1 locked into something where I said I didn't see
2 him until that point with the car.
3         MS. FROST: No. And just so --
4         THE WITNESS: I --
5         MS. FROST: -- for the record, let me
6 just say, if at any point you need to go back and
7 clarify something that you said before, I
8 absolutely want you to do that.
9         Our purpose is here today is to get as
10 clear of a record and accurate a record as
11 possible. So at any time just stop me and do
12 that.
13         THE WITNESS: Okay.
14         MR. IWEANOGE: And you want to do it now
15 or you want to wait until come back?
16         THE WITNESS: It's a just a quick --
17         MR. IWEANOGE: She's still not finished
18 -- because she's not finished on that one, so you
19 --
20         MS. FROST: Well, I mean, while it's on
21 your mind you might as well.

66

1         THE WITNESS: Okay.
2         MR. IWEANOGE: All right.
3     A. I didn't know it was a police car at the
4 time. I saw a car. He claimed that I saw him
5 and I walked away from him, I started like
6 fleeing.
7         When I walked out of my apartment I
8 noticed a car with lights. And it's people that
9 park on the street, you know. So I didn't notice
10 that it was a police car. It was a car, it had
11 lights on. I wasn't aware of his presence, in
12 particular. Like I said, I didn't know he'd come
13 after me or looking for me or he was going to
14 tackle me from behind. I didn't know anybody
15 called the police or anything.
16         But there was a car with lights on that
17 I found out later after he tackled me that that
18 was his car. It was a police after and it did
19 have lights on top and it was marked on the side.
20 But not until that point, after I was on the
21 ground bloody and bruised, that I knew that it

67

1 was a police vehicle.
2     Q. Okay. Thank you for your clarification.
3         (Break taken.)
4         BY MS. FROST:
5     Q. Back on the record. Mr. Tafler, what
6 I'd like you to do is just to help me understand
7 sort of, the lay of the land. If you would do
8 like a diagram of where your apartment is, the
9 alley where Hector's car was parked, the path
10 that you took, the path that Hector took, and so
11 forth. And we can start talking about that with
12 a visual guide.
13     A. Okay. (Witness complying.)
14     Q. That doesn't have to be artistic.
15     A. Okay. That's a really bad car, sort of
16 like grade school, so.
17     Q. Can you tell me what's drawn here?
18     A. Here's 18th here (indicating).
19     Q. Uh-huh.
20     A. And this is where intersects with U
21 (indicating).

68

1     Q. Okay. Is --
2     A. Here's my apartment building
3 (indicating).
4     Q. Uh-huh?
5     A. With my apartment in the back, here
6 (indicating). It's like my little patio here
7 (indicating), it's like a little parking lot here
8 (indicating).
9     Q. Uh-huh. Can you just write in here
10 (indicating) parking area, just so it's clean on
11 the exhibit?
12     A. (Witness complying.) And these are all
13 businesses here (indicating).
14     Q. Uh-huh.
15     A. And these are homes (indicating).
16     Q. Okay.
17     A. With -- and this is, you know,
18 individual parking slots for the houses
19 (indicating).
20     Q. Uh-huh.
21     A. So it's all generally -- I mean this is

17 (Pages 65 to 68)

DEPOSITION OF HOWARD TAFLER
Conducted on May 21, 2007

69

1    all think -- these are -- I'm not quite sure, but
2    these are all homes back here (indicating) and
3    parking. And this alleyway (indicating) had
4    parking for the homes in the back.
5          And my apartment's here (indicating). I
6    came back from work.
7          Q. Uh-huh.
8          A. Walked up 18th Street.
9          Q. Uh-huh.
10         A. (Indicating) and went into my apartment.
11         Q. Okay. The record will reflect the
12   witness has drawn an arrow going up 18th Street,
13   turning right into the alley, and then another
14   turn towards the apartment, which is marked on
15   the exhibit.
16         A. Went into the apartment. No one was
17   there.
18         Q. Uh-huh.
19         A. Left my apartment (indicating). Same
20   route that I took in, at right at about here
21   (indicating). And I have pictures that would

70

1    probably better clarify how this is laid out.
2          Q. Uh-huh.
3          A. So but about this point in the alleyway
4    (indicating) is where I got tackled. And --
5          Q. And, for the record, that's an X with a
6    circle kind of drawn through it of the area where
7    the witness was tackled.
8          Which direction did Officer Hector come
9    from?
10         A. He came from behind me. I was walking
11   in this direction (indicating), so he came from
12   further down the alley. And he was parked where
13   people's -- whoever lived on either U Street or
14   maybe T Street down here --
15         Q. Uh-huh.
16         A. There's all -- there's all parking.
17   Because it is the alleyway in back of homes on
18   both streets (indicating). And he was parked in
19   the alley further -- you know, probably -- I
20   never measured it. I don't have a measuring tape
21   that long. I'd probably say 100 to 150 feet.

71

1          Q. Okay.
2          A. If you ask me is where his car was
3    parked with his lights on, which is after -- this
4    is where he went through (indicating) after he
5    tackled he and handcuffed me. And I was laying
6    on the ground I saw him walk away, go back to his
7    car, kind of back in that direction (indicating).
8          Q. Was there anyone else with him when he
9    tackled you and handcuffed you?
10         A. No. He was -- to my knowledge, he was
11   by himself.
12         Q. Uh-huh.
13         A. I didn't see anybody else, because it
14   was a really hard hit that I took. You know, my
15   face was bloody and I ended up needing 18
16   stitches or thereabouts in my face to repair it.
17   So, I didn't see -- there were two officers that
18   came later, that was standing about 10 feet to my
19   left. I was laid out on the ground like that
20   (indicating), handcuffed me -- that's my little
21   -- that's me with my hands behind my back

72

1    (indicating) --
2          Q. (Counsel nods head.)
3          A. -- handcuffed. And there was two
4    officers standing right here (indicating) at some
5    point in time after.
6          Q. So and that's the opposite side of the
7    alley from where your apartment is?
8          A. Correct. And I was wondering where
9    Hector had gone off to.
10         THE WITNESS: How do you draw a police
11   officer?
12         Q. You don't have to be specific. You can
13   draw two stick figures where you depicted
14   yourself laying in the alley.
15         A. And he had a hat on him (indicating).
16   It's a baseball hat, so.
17         Q. Was he wearing a baseball hat?
18         A. No, no.
19         Q. Okay.
20         A. No, I'm jut -- that's just to represent
21   that they were police. I don't know how to draw

18 (Pages 69 to 72)

DEPOSITION OF HOWARD TAFLER
Conducted on May 21, 2007

73

1  a police hat.
2      Q.  Okay.
3      A.  So but he wasn't wearing a hat.  But
4  that's where he went back to.  And he was wearing
5  a Nautica shirt.
6      Q.  Uh-huh.
7      A.  Nautica (indicating).
8      Q.  And when did you first realize --
9      A.  But these two -- these two cops went to
10  try to figure out where Nautica went, which is
11  Anthony Hector.  They told me that, oh, that guy,
12  that was some guy walking down the street, you
13  know.  We don't know who he was and probably
14  never see him again.
15          And I was like, it was some guy?  Some
16  guy?  I'm handcuffed.  It's just some anonymous
17  guy just walking down the street.  And I was -- I
18  was pretty pissed.  Because if I'm -- you know,
19  I'm lucky that I saw -- was able to get a
20  description of his clothing, otherwise, I don't
21  think I'd be able to identify him.  I mean,

74

1  that's how -- that's how I was able to identify
2  him, by his clothing.
3          And later ascertained that he was
4  Anthony Hector.  But they tried -- they tried to
5  play it off like, we don't know who that was,
6  we'll never see him again.  I don't think so.
7  No, where's the guy with the Nautica shirt?
8  Where is the guy with the Nautica shirt, you
9  know?  And it ended up being Anthony Hector.  But
10  they tried to say, like it wasn't -- they didn't
11  know who it was.  They'd never see him again, and
12  he was out of our sight, sorry.
13      Q.  So at any point during this evening you
14  weren't able to make a description of the
15  person that tackled you as Anthony Hector,
16  correct?
17      A.  I did when he came back over.
18      Q.  And then you saw his -- his name, being
19  Anthony Hector?
20      A.  As far as his name is concerned, no.
21  But I saw his face that day, and I saw his

75

1  clothing, and he was the arresting officer.  And
2  later, after I filed the complaint against him
3  for having talked to me like that, he later,
4  after this incident on August 5th, 2002, stopped
5  me walking down the street --
6      Q.  Well, we'll get to that.  I mean, we're
7  still on --
8      A.  -- and made it very clear that he was
9  Anthony Hector.
10      Q.  Okay.  And we will definitely get to
11  that.  I just want to focus on this to keep the
12  record straight.
13          Do you happen to know the names of these
14  two officers on your diagram on the left of you?
15      A.  There was a lot going on, and I didn't
16  -- you know, I wasn't -- no, I didn't.  I was on
17  the ground, and as far as getting badge numbers,
18  I wasn't able to, so.  They were standing up, I
19  was laid flat on the ground, bleeding from my
20  face profusely.
21      Q.  You were face down at this time?

76

1      A.  Face down.
2      Q.  Okay.  And how long were you face down
3  on the ground?
4      A.  It seemed like forever.  It seemed like
5  a long time.
6      Q.  Approximately?
7      A.  I couldn't quite say.  It could have
8  been -- it could have been 10 minutes, it could
9  have been half an hour.  It just seemed like a
10  long time.  People were starting to gather
11  around, stuff like that, you know, and there were
12  lights flashing.
13          And it just -- it just seemed very -- I
14  wanted to get out of there, I didn't want to be
15  there.  I didn't want to be beat up and bleeding.
16  I wanted to go to the hospital, I wanted
17  something -- I was sitting there worried that,
18  you know, there is an alley with rats and, you
19  know, I don't know how many people peeing there
20  every night.  It's right off 18th Street and it's
21  disgusting, and my face was torn up, and it was

77

1  just gross. I didn't want to be there, it was
2  terrible.
3      Q. Did Hector say anything to you that
4  night?
5      A. No. Not to my knowledge.
6      Q. Did you say anything to him that night?
7      A. I might have -- I'm pretty sure I would
8  have, you know, said, what the hell? What was
9  that all about? Why -- why would you -- why did
10  you do that, you know? Why didn't you ask me to
11  stop, identify myself, you know? This is
12  ridiculous.
13      Q. Did you have any conversations with the
14  other officers aside from who the guy in the
15  Nautica shirt, and them saying we don't know,
16  some guy off the street?
17      A. Yes. I said -- pretty much said --
18  excuse my language -- but that's bullshit, you
19  know exactly who it is. Stop covering up for the
20  guy, where is he? He's wearing a Nautica shirt,
21  where is he?

78

1      Q. Other than that, any other conversations
2  between you and those officers?
3      A. I'm not quite sure if they were the ones
4  that ended up driving me to -- I think it was
5  3D --
6      Q. Uh-huh.
7      A. -- to get locked up. They may have been
8  the same two, I'm not quite sure. Because my
9  focus was basically on getting a physical
10  description of the guy who had tackled me. And
11  it might have been those two officers that drove
12  me to 3D that ended up taking me to the hospital,
13  took me to Georgetown, after the -- the Sergeant
14  or whoever is in charge of intake told them that
15  they're not allowed to bring me into jail looking
16  the way I do in my condition.
17      Q. Right. But you said your focus was on
18  getting a physical description of the person that
19  tackled you, correct?
20      A. Very much so.
21      Q. Okay. And so you're not sure if these

79

1  were the two officers that took you to the 3rd
2  District or not?
3      A. I'm not quite sure, no.
4      Q. And I believe that their District is
5  less than a block from your apartment building;
6  is that correct?
7      A. Exactly. Yes, it is.
8      Q. Were you taken there by squad car?
9      A. Yes.
10      Q. And you were arrested that evening?
11      A. I was arrested and booked.
12      Q. And put into a cell at the 3rd District?
13      A. Yes.
14      Q. And in time were you transported to the
15  D.C. Jail?
16      A. I was in the 3rd District Station for
17  two days. And then I think on Monday morning I
18  was transferred over to the Courthouse to my
19  arrangement, whatever it's called. I don't know
20  the legal terms for --
21      Q. That's okay.

80

1      A. -- these things.
2      Q. Your were arrested on the morning of
3  August 4th, 2002, correct?
4      A. I think it was after midnight on
5  Saturday morning. I don't -- I mean if it was
6  August 4th or the 5th, I don't know.
7      Q. Yeah.
8      A. If I could look at a calendar.
9      Q. Okay. Well, you were admitted to the ER
10  at Georgetown on August -- I mean, early morning
11  of August 4th, 2002?
12      A. Okay.
13      Q. So you were arrested on August 4, 2002?
14      A. That sounds about right.
15      Q. It was very early morning?
16      A. Okay.
17      Q. And that was actually a Sunday?
18      A. A Sunday?
19      Q. It was a Sunday.
20      A. I thought it was a Saturday morning.
21      Q. Okay. Well, according to the all the

20 (Pages 77 to 80)

DEPOSITION OF HOWARD TAFLER
Conducted on May 21, 2007

81

1    paperwork you were arrested was August 4th, 2002,
2    which was a Sunday.
3        A.   Okay.
4        Q.   And you said that you were presented to
5    the Court on Monday; is that correct?
6        A.   Monday, yes.
7        Q.   August 5th?
8        A.   I would have to look at a calendar. I
9    can't -- you know, this was five years ago and to
10   be specific about exact dates without having a
11   calendar in front of me, I don't want to lock
12   myself into any specific dates without something
13   to -- some sort reference material.
14       Q.   I understand. But my question to you
15   is --
16       A.   I thought -- I thought -- I thought I
17   was arrested on a Friday night/Sat -- early
18   Saturday morning. To my knowledge, I thought I
19   stayed there Saturday and Sunday and went before
20   the judge on Monday morning.
21       Q.   Okay. And what I'm saying to you is, in

82

1    actuality, you were arrested on a Sunday morning
2    and presented to the Court on Monday morning.
3        A.   If that's -- if that's how the dates --
4    if that's how it was then that how it was.
5        Q.   But you would agree that a calendar
6    would be correct, right?
7        A.   Yes. Yes.
8        Q.   So if, indeed, August 4th was a Sunday
9    and August 5th was a Monday, then, in actuality,
10   you did not spend an entire weekend in jail,
11   correct?
12       A.   I guess you could say that.
13       Q.   You also said the officers -- and you
14   mentioned, and already testified, that the
15   officers were reprimanded for not taking you to
16   the hospital?
17       A.   Yes. They were screamed at for how
18   could they -- not screamed at -- they were --
19   they were spoken to sternly saying that I
20   can't -- it wasn't a long thing. I mean, I heard
21   it, you can't bring him in here like this. "You

83

1    know better, you can't bring him in here like
2    that, get him out. Turn around and get him out."
3    And that was it.
4        Q.   Okay. Do you know who said this?
5        A.   You know, if I had a -- perhaps, this
6    nice lady here, the stenographer, I could have
7    had it, but I didn't and I didn't have a pen and
8    paper. And I was making contact with a lot of
9    people, I didn't get page numbers or names.
10       Q.   And that's fair enough. I'm just trying
11   to understand what -- what you know.
12       A.   No, no.
13       Q.   I understand that this is five years
14   ago, that's why my questions are just to try to
15   ascertain what you know to help me.
16   So --
17       A.   And I'm sure, you know, whoever was
18   working on these particular nights, meaning, if
19   you want to go back and look to see who was
20   working that night, who was shift manager or
21   shift leader or sergeant or, you know, the key

84

1    guy or -- I don't know. It's probably on record
2    somewhere, I don't -- I don't have those records.
3    I'm not privy to that information.
4        Q.   But it was your impression that it was
5    someone that was in a position of authority at
6    the 3rd District that said this?
7        A.   I don't know what kind of authority he
8    had. I mean he was -- maybe he was just -- I
9    don't know.
10       Q.   You couldn't tell --
11       A.   I don't know if he was necessarily in
12   authority position over them. Maybe he was just
13   looking out for their best interest so that they
14   didn't get in trouble, and told them that turn
15   around and get me out of here before they got in
16   trouble. I don't know. I don't know that he was
17   in authority. He was just -- he just told them
18   to turn around and take me to the hospital,
19   because I can't be -- I can't be -- I can't be
20   jailed with flesh hanging off my face.
21       Q.   And so from -- you then were taken to

21 (Pages 81 to 84)

DEPOSITION OF HOWARD TAFLER
Conducted on May 21, 2007

85

```
1    the hospital?
2        A.  Yes.
3        Q.  By ambulance or squad car?
4        A.  Squad car.
5        Q.  Okay.  And how many officers were in the
6    office with you?
7        A.  Two.
8        Q.  Same two that brought you in?
9        A.  Yes.
10       Q.  Was there any discussions between you
11   and these two officers on the way to the
12   hospital?
13       A.  Yeah.  I told them -- I said I didn't do
14   anything.  I hadn't done anything and, you know,
15   I'd been victimized and I just didn't understand
16   what was going on.  And I told them to treat me
17   right.  I said do me right, you know.  Basically
18   I wanted them to let me go.
19           And what they ended up doing was taking
20   me to Georgetown Hospital instead of Howard
21   University.  Howard is a lot closer to where I
```

87

```
1    preferred to go to Georgetown anyway?
2        A.  It was never discussed.  I mean, I
3    don't -- I don't know what kind of hospital
4    Howard is.  But, given the locations of the two,
5    and the reputation of Georgetown, I probably
6    would have preferred go to Georgetown.  But, I
7    mean they -- as far as I know they could have
8    just been prolonging my -- torturing my agony by
9    keeping me in the car longer, when it's two or
10   three times as far.
11       Q.  Did you ask them what hospital they were
12   taking you to?
13       A.  No.
14       Q.  Did you receive proper treatment at
15   Georgetown?
16       A.  When they stitched my face up.  I still
17   have a lot of scarring on my face and patches
18   where hair won't grow back, and it's -- it's very
19   noticeable, specially when I get a shadow on my
20   face, 5:00 shadow.  Adequate treatment?  I don't
21   know.
```

86

```
1    live, and they probably should have taken me
2    there, but maybe they felt bad for me and took me
3    to a better hospital.  I don't know.
4        Q.  Did you request to be taken to Howard?
5        A.  I didn't request to be taken to Howard,
6    they took me to Georgetown on their own.  But
7    Howard is much closer.
8        Q.  So you rather would have rather had gone
9    to Howard?
10       A.  I don't know what was going on in their
11   mind.  Georgetown is a way further hike.  Maybe
12   they were prolonging my -- me seeing a doctor.
13   Maybe that was like a way of torturing me.
14           If I had a choice I would have -- I
15   would have rather have gone to Georgetown, but I
16   didn't ask to go to Georgetown.  How they decided
17   to get -- why they decided to take me to
18   Georgetown instead of taking me to Howard, I
19   don't know.  They never voiced their reason to
20   me.
21       Q.  But you just said you would have
```

88

```
1        Q.  Did you ever file a claim for Georgetown
2    for improper -- for negligent medical care?
3        A.  No.
4        Q.  And, in fact, you actually went back to
5    Georgetown a number of times after --
6        A.  I had to get the stitches removed.
7        Q.  And after that you went back to
8    Georgetown Hospital?
9        A.  If that's what my medical records state.
10   I think I went back there, because they thought I
11   got a hernia from this whole thing, too.
12       Q.  Uh-huh.
13       A.  And one of the doctors told me that I
14   had one, actually, and needed -- he wanted to put
15   some sort of screen in me.  It's like a little
16   surgical procedure.
17           And when I went to go schedule it, he
18   went on vacation on something like that, and his
19   office never called me back.  And I started
20   actually feeling a little better in that area.
21           You know, there was a lot of pains that
```

22 (Pages 85 to 88)

DEPOSITION OF HOWARD TAFLER
Conducted on May 21, 2007

89

1 were associated with this incident that came
2 later.
3      Q. All right. We'll get into that.
4      MS. FROST: Can you mark this, please.
5      (Whereupon, Tafler Deposition Exhibit
6 No. 2, diagram, marked.)
7      (Whereupon, Tafler Deposition Exhibit
8 No. 3, medical records, marked.)
9      Q. Okay. Mr. Tafler, I show what has been
10 marked for identification as Deposition Exhibit
11 No. 3. These are medical records that you
12 produced in response to our document request,
13 correct?
14      A. (Witness reviewing records.) Yeah. It
15 appears to be.
16      Q. Okay. Do you have any reason to doubt
17 that?
18      A. I mean -- well, I'm just looking at this
19 second page here, it says patient fell attempting
20 to flee police, and that's bull. So anything
21 else they say on here is -- I don't know, I

90

1 haven't read it all. This ETOH night, what does
2 that mean? They're trying to insinuate that I'm
3 drunk? That's baloney, because I wasn't drunk.
4 Okay. I had a drink, and this is bull, because I
5 wasn't fleeing police.
6      So anything that's on here other than
7 where it says I lacerated my face, that I agree
8 with. I got stitches. Anything else is, I
9 possibly might not agree with. I don't know.
10      Q. Okay. But these RND here --
11      A. Fell on street, no. Was tackled on the
12 street. Okay. Fleeing police, never did I flee
13 the police.
14      Q. But these are your medical records,
15 correct?
16      A. Yes.
17      Q. It has your name on it, correct?
18      A. Yes.
19      Q. And your Social Security number, at the
20 bottom?
21      A. Yes.

91

1      Q. Okay. And if you turn to the second
2 page of the record where it says initial
3 assessment, as you've pointed out, it says,
4 patient fell when attempting to flee police; is
5 that correct?
6      A. Is it correct that I was fleeing the
7 police, or is it correct that it says that I was
8 attempting to flee the police?
9      Q. Is it correct that it says that you fell
10 while attempting to flee the police?
11      A. That's what it says.
12      Q. Okay. But you disagree with that?
13      A. Completely.
14      Q. Okay. It also says, if you look at
15 directly above that and to the right, you were
16 marked as a non-urgent accident; is that correct?
17      A. (Witness reviewing record.) That's what
18 it says. But if you go back and look at the
19 pictures, which I'm sure we'll introduce that
20 into court, you can -- or whoever is -- is
21 judging them can make that determination whether

92

1 it was urgent or not.
2      All I know is, when I was in the
3 holding cell with 50 other people who were there
4 for -- ranging from stabbing people -- I was the
5 only person that was bloodied up and had been
6 beaten up. I mean, there was murderers and
7 people that had done horrible things to other
8 people, I had done nothing and I'm -- you know.
9      Q. My question to you, though, is, are you
10 marked here as being a non-urgent patient?
11      A. That's what it says.
12      Q. Okay. And it also indicate on that same
13 page -- no, I'm sorry -- actually the next page,
14 third page of that exhibit, No. 3, under the
15 psych column, there's a circle around the word
16 judgment. And then it says inebriated, but
17 appropriate; is that correct?
18      A. Where are you looking?
19      Q. The third page, where judgment is
20 circled. It says inebriated, but appropriate; is
21 that correct?

23 (Pages 89 to 92)

DEPOSITION OF HOWARD TAFLER
Conducted on May 21, 2007

93

1    A. That's what it says. I wouldn't say
2    that I was inebriated, I had a drink.
3    Q. So you would disagree with that
4    statement in the records, then?
5    A. Absolutely.
6    Q. Okay. Above that it appears to say --
7    indicate that you've had a 1 to 2 centimeter
8    laceration, superficial, upper lip, and
9    approximately a 4 centimeter laceration on the
10    bottom of your chin actively bleeding; is that
11    correct? Is it correct that it says that?
12        (Brief interruption.)
13    A. I'm sorry, repeat the question.
14    Q. Sure. Right up here (indicating), it
15    indicates that you had is 1 to 2 centimeter
16    laceration, superficial, upper lip, and
17    approximately a 4 centimeter laceration on the
18    bottom of your chin, which is actively bleeding?
19    A. Correct.
20    Q. Okay. Does that accurately describe the
21    injuries that you had?

94

1    A. Superficial upper lip, I don't know. He
2    split my upper lip open, and there's other scars
3    that you can see (indicating).
4    Q. Uh-huh.
5    A. 4 centimeter laceration at the bottom of
6    my jaw, is that what it says.
7    Q. I think it says chin.
8    A. Chin. Yeah. I mean you can see this
9    scaring here (indicating), and here (indicating).
10    It's like this was all ripped open. I saw myself
11    in the reflection and there was meat hanging off
12    my face.
13    Q. And you didn't lose consciousness that
14    night, correct?
15    A. No.
16    Q. And on the first page of Exhibit 3,
17    where it says discharge instruction -- the very
18    first page.
19    A. (Witness complying.)
20    Q. The instructions were the keep it clean
21    and dry, correct?

95

1    A. Yes.
2    Q. And you were prescribed Tylenol or
3    Motrin for the pain, correct?
4    A. Correct.
5    Q. Okay. Does it say anywhere in the
6    medical records that you received 18 stitches?
7    A. No, it doesn't. Not to my knowledge.
8    By when I went to have go have my stitches
9    removed, the guy that put them in took them out.
10    Q. And what doctor was that?
11    A. It says here Dolin, if that's him. I
12    had -- to my recollection it was 8 stitches
13    outside, and then they were an equal number or
14    more, like 8 to 10 -- he wasn't sure how many at
15    the time, because they were inside. They were
16    dissolving stitches, so we left them in there.
17    He said that they were like 8 to 10 stitches
18    internally that dissolved, and there was about 8
19    on the outside that he removed.
20    Q. Okay. And did you happen to see
21    anything in these medical records that the flesh

96

1    was ripped and hanging off your face?
2    A. That's what it looked like to me.
3    Q. But that's not indicated in with the
4    medical records, is it?
5    A. If I was writing the record, that's how
6    I would -- I mean if she doesn't write it like
7    that then, you know, I guess everybody's
8    wording's a little different. And if I saw
9    another person that looked like I did, I would
10    write it like that.
11        MS. FROST: Can you mark this, please.
12        (Whereupon, Tafler Deposition Exhibit
13    No. 4, medical records, marked.)
14    Q. Mr. Tafler, did you want to add
15    something?
16    A. Yeah. I'm noticing at the bottom here
17    it says Teresa Dolin.
18    Q. And when you say here, you're talking
19    about Deposition Exhibit No. 3?
20    A. Yes. There was a guy who put the
21    stitches in and removed it. I don't know who

24 (Pages 93 to 96)

DEPOSITION OF HOWARD TAFLER
Conducted on May 21, 2007

97

1  Teresa Dolin is. Maybe she was the attending
2  doctor.
3      But as far as who put them in, who put
4  the stitches in and took them out, there was a
5  guy.
6      Q. Do you know whether it was a doctor or a
7  nurse?
8      A. Don't know.
9      Q. Okay. I'm showing you what's been
10 marked as Deposition Exhibit No. 4. Do you
11 recognize this document as one being produced to
12 us?
13     A. (Witness reviewing record.) It's got my
14 name on it. I haven't looked at thee medical
15 records in a while. So, and it's hard to read
16 the writing.
17     Q. It is.
18     A. Suffered hip -- lip suture removal.
19 Yeah.
20     Q. So this is from when you got the
21 stitches taken out, correct?

98

1      A. Correct.
2      Q. And the date on this a August 9th, 2002?
3      A. Yes.
4      Q. And as far as you can recall, there was
5  no issue with the -- the suture, correct?
6      A. What do you mean by issue?
7      Q. No complications?
8      A. No.
9      Q. Okay.
10     A. Sutures come out relatively easy. I
11 mean, I had big ugly scabs on my face for a
12 couple weeks after, you know, where the -- where
13 the skin grew back. That was completely -- where
14 the skin tore off my face it couldn't be
15 stitched.
16     Q. Uh-huh.
17     A. That healed over in time. But the
18 stitches came out nicely, easily.
19     Q. Can you show me where on your face the
20 skin was torn off? Can you point to the area?
21     A. There was blank spot right here

99

1  (indicating).
2      Q. Uh-huh.
3      A. You can probably better see it in the
4  pictures, which we have in evidence. You
5  probably have them already. We've supplies them
6  to you.
7      Q. Actually we do have pictures, and we'll
8  get to that. The problem I have with the
9  pictures is that they're very hard to make out.
10     A. Yeah.
11     Q. And I'm hoping that --
12     A. I can probably --
13     Q. -- you have color?
14     A. Give you some color -- yeah. Yeah.
15 I'll provide some better pictures for you.
16     Q. And would you agree that you really
17 can't appreciate the nature of your injuries from
18 these pictures that I have in front of me?
19     A. Yeah. I mean you can -- you know, in
20 this one (indicating) you can see it a little.
21     Q. It looks like a scab maybe?

100

1      A. Yeah. Because this (indicating) was all
2  torn. It was torn from here to here
3  (indicating), all the way around, and my lip was
4  split, so.
5      Q. Okay.
6      A. I'm sure I have duplicates of those
7  pictures. I'll get them to you.
8      Q. And as far as the District Exhibit No. 4
9  that you have in front of you, other than the
10 suture removal there was no other treatment
11 indicated here, correct?
12     A. (Witness reviewing record.) No. No.
13 It just says follow-up with my doctor as needed,
14 which I did over time.
15     Q. Okay. And other than the complaints
16 regarding the cut -- cuts on your face, there's
17 no indication in these records of any other
18 medical complaints when you visited Georgetown
19 University on both August 4th and August 9th,
20 2002, correct?
21     A. I had other medical issues. My knees

25 (Pages 97 to 100)

DEPOSITION OF HOWARD TAFLER
Conducted on May 21, 2007

101

1  were swollen and very painful, and you could
2  probably see it in his --
3      THE WITNESS: Do you have those photos?
4  The ones you just had out.
5      MR. IWEANOGE: That one he had, that's
6  what I need -- I need to get color pictures for
7  it.
8      A. As you can see in this (indicating), my
9  knee is very much swollen there. And there's
10 large, you know, very large scrapes on it.
11     MS. FROST: Can you mark this as of
12 Exhibit 5.
13     (Whereupon, Tafler Deposition Exhibit
14 No. 5, photographs, marked.)
15     Q. Are these this photographs you were just
16 talking about on Defendants -- the District
17 Exhibit No. 5?
18     A. Correct.
19     Q. And the first page that has -- they are
20 three photographs of your lower extremities?
21     A. Yes.

102

1      Q. And what does that show?
2      A. It shows injuries -- these are a little
3  hard to make out. I don't know what -- the only
4  thing I can see, that my right knee is severely
5  swollen. And this is from the side angle, you
6  can really see it.
7      MR. IWEANOGE: That's are a little
8  better.
9      A. I just remember being in jail and not
10 being able to stand up or walk, my legs wouldn't
11 bend. And, you know, I pretty much just laid
12 there, because I couldn't move.
13     MR. IWEANOGE: (Introducing
14 photographs.)
15     A. Those are clearer. You know, just
16 because this -- this hospital record don't say
17 it, it don't mean that my neck didn't hurt and my
18 back didn't hurt, my knees didn't hurt. I was in
19 a lot of pain.
20     I mean there was some blunt force trauma
21 to my head and, you know, to this day I actually

103

1      -- I got ringing in my ears, I go -- I had the
2  TMJ, and that kind -- that comes and goes.
3  Motrin helps with that, it takes the swelling
4  down. But I've had a lot of injuries -- a lot
5  pain that's -- that dates back to this incident
6  specifically.
7      Q. So when you were admitted to Georgetown
8  Hospital on the night of the incident that you
9  had -- you were experiencing pain in the other
10 parts of your body, correct?
11     A. Correct. But these -- these kind of
12 injuries, I thought that they would go away in
13 time, they were just scrapes and stuff like that.
14     Q. Did you complain about pain that you
15 felt in the other parts of your body while you
16 were at Georgetown and August 4th, 2002?
17     A. On August 4th. Yeah, I did.
18     Q. You've made these -- you indicated what
19 to them what was hurting?
20     A. I wanted them to look at my -- at my
21 knees and my body parts that were aching.

104

1      Q. Did they do that?
2      A. No. I think -- actually they -- they
3  actually just fixed me up and sent me out. I was
4  treated there like I was guilty of having done
5  something because I'm in handcuffs. And I got
6  treated like a -- a criminal by them. In and
7  out, get him to jail. He smells like alcohol --
8  they wrote it down, get him to jail.
9      I think if I had gone in there as a --
10 not under arrest, on my own, if -- you know, if I
11 fell down the stairs or got in a little car
12 accident and -- and came in on my own, by my own
13 will, I would have been treated a lot better. So
14 actually I do have a complaint against
15 Georgetown.
16     Q. Okay. When you were there on August
17 9th, how were you treated?
18     A. I felt like I was treated with a little
19 disregard, but, you know.
20     Q. How so?
21     A. Because the same guy took my stitches

26 (Pages 101 to 104)

DEPOSITION OF HOWARD TAPLER
Conducted on May 21, 2007

141

1    Q. Okay.
2    A. It was like two or three blocks from our
3  house.
4    Q. Okay. So where were you -- what were
5  you doing on Euclid, then?
6    A. I was just walking around.
7    Q. Do you remember where you were going?
8    A. No. Just walked around the
9  neighborhood.
10    Q. Was anyone with Officer Hector?
11    A. There was another officer.
12    Q. Do you know that officer's name?
13    A. Uh-uh.
14    Q. Were -- was Officer Hector in uniform?
15    A. Yes.
16    Q. Was the other officer in uniform?
17    A. Yes.
18    Q. Were they -- when you first saw them,
19  were they in a car or were they walking down the
20  street?
21    A. They called me from behind, and they

142

1  said that -- hey, yo, stop, come here. And I
2  didn't know they were talking to me, because I
3  wasn't doing -- I was just walking. And they
4  started screaming louder, you, yo, hey, stop,
5  come back here, turn around, where you going,
6  stop when I say stop.
7        So I turned around like, are you talking
8  to me? He's like, yeah, I'm talk to you, get
9  back here, get back here, and he pulled me back.
10  I don't understand what's going.
11    Q. How far ahead of them were you?
12    A. 40 feet maybe.
13    Q. So did you go --
14    A. Half a block.
15    Q. Half a block?
16    A. Well, maybe that's -- yeah. Maybe like
17  half a block. I mean I -- yeah. They were
18  calling me so far behind, I didn't know they were
19  talking to me.
20    Q. So did you turn around and go back to
21  where they were?

143

1    A. Yeah. He said you'd better -- he said
2  something like, you'd better stop when I say
3  stop. And I was like, all right, what? So I
4  went back. And he said --
5    Q. And where were they standing on Euclid?
6    A. They were standing -- there was an
7  apartment building that had a glass lobby.
8    Q. Uh-huh.
9    A. They asked me what I'm doing around
10  here. And I just moved for -- like I lived
11  closer to there. I didn't live down at my other
12  apartment where we -- where the original incident
13  happened. So he asked me what I was doing around
14  here. I'm like, I live here, you know.
15        And he asked me who I know around here.
16  I was like no one. And there was a few people
17  sitting outside, do you know them? I was like
18  no. And he asked them if they knew me, they said
19  no. And then he's like, come here, and he pulled
20  me -- he brought me into the building, and there
21  was some people sitting in there.

144

1    Q. So it's an apartment building, you said?
2    A. It was an apartment building.
3    Q. With a glass lobby?
4    A. Yeah.
5    Q. And where on Euclid is this?
6    A. Between 16th and 17th, I think.
7    Q. Okay.
8    A. So he pulls me into the lobby of this
9  building, and he starts asking do I know anybody
10  in here? And I said no. You know him
11  (indicating)? No. And he asked the guy -- the
12  other guy, he asked him if he knew me, and he
13  said no. There was like maybe like three or four
14  people and which one he's like, do you
15  (indicating) know him? Do you (indicating) know
16  him? Do you (indicating) know him? And after
17  -- after each one of them said they didn't know
18  me, he's like, all right, go (indicating). You
19  know, you go (indicating). You (indicating) get
20  out of here. Okay. (indicating) get out of
21  here. And he sent everybody upstairs.

36 (Pages 141 to 144)

DEPOSITION OF HOWARD TAFLER
Conducted on May 21, 2007

145

1    Okay. So now it's just me and the two
2    officers in this -- in this lobby and nobody
3    else. And he's like, you don't remember me, do
4    you? And I was like no. He's like, you don't
5    remember me? And I look at him and I'm trying to
6    -- trying to figure out how I know him, and I
7    looked at his -- at his badge. I think it said
8    Hector. But I don't know if it said Hector or it
9    just became evident at that point who it was,
10   because he said you filed a complaint against me.
11   He told me who he was. He didn't say hi, I'm
12   Anthony Hector, he said you had filed a complaint
13   against me. And I had filed a complaint against
14   him.
15   And right there he told me if ever filed
16   another complaint against him, he'll make sure I
17   don't walk away from it this time. He made sure
18   I heard it. He said, you hear me? You hear me?
19   I was like, yeah, I hear you. He was freakin me
20   the hell out, you know. Because I didn't
21   recognize him, you know. He was in uniform, you

146

1    know. It's like -- like this guy can sneak up on
2    you. He snuck up, he was plainclothes the first
3    time, tackled me, and you know, did also sorts of
4    damage. Which I wish you could see the pictures,
5    it was totally out of line.
6    But, you know, now he's wearing a
7    uniform. And, again, I just recognize him.
8    Like if he didn't tell me who he was, I might not
9    have recognized him.
10   Q.   After he told you who he was, did you
11   then recognize him?
12   A.   Yeah. And became very frightened that
13   something was going to happen in that lobby and
14   there were no witnesses there. Everybody was
15   gone. And it would be his word against mine.
16   Q.   Did you say anything to him?
17   A.   What was I going to say? He just
18   threatened my life. I took that as a threat
19   against my life, if I filed another complaint
20   against him he would make sure I don't walk away
21   next time.

147

1    You know, considering the damage he did
2    the first time, which was pretty extensive, that
3    I managed to walk away from, I can't imagine what
4    he'd do to me the next time that I couldn't walk
5    away from. You know, he knows the area that I
6    live in, and I don't see him coming when he
7    comes. And, you know, what was I going to do,
8    file a complaint against him for threatening me
9    that if I ever filed another complaint against
10   him, that he'd make sure I wouldn't walk again.
11   I was scared to file a complaint -- I
12   would have been -- I would have loved to file
13   another complaint about him -- about that
14   specific threat. And that actually became a very
15   big part of like the reason it took me so long to
16   file this case, was because I was scared that
17   that guy was going come after me if I filed this
18   case. That's why we filed it three years to the
19   day. I mean, I was thinking for years am I going
20   to file this, am I going to file this and I was
21   -- I was squared to.

148

1    And then it all came to a head on August
2    5th, again, 2007, with the roof incident.
3    Q.   5.
4    A.   2005.
5    Q.   We'll get to that.
6    A.   That guy is a bad -- this guy -- I
7    understand he's not an officer anymore and
8    probably for good reason, you know. I know he's
9    got a right to counsel, but I mean, he's not --
10   he not good.
11   Q.   The -- the other officer, did he say
12   anything to you?
13   A.   No.
14   Q.   He just stood there?
15   A.   Uh-huh.
16   Q.   Did you get his name?
17   A.   No.
18   Q.   Okay. And you said you had filed a
19   complaint against Hector?
20   A.   Yes.
21   Q.   When did you file the complaint?

37 (Pages 145 to 148)

PRECISE REPORTING SERVICES
(301) 210-5092  (877) 4 A STENO

DEPOSITION OF HOWARD TAFLER
Conducted on May 21, 2007

149

1     A. I filed a complained after the incident
2   on August 5th, 2002 or 4, or whatever it was that
3   you have.
4     Q. How long after the incident?
5     A. Shortly thereafter. I mean, my public
6   defender who, you know, got me out of jail or
7   whatever, she was my -- I don't know if she got
8   me out or I just was released on my own
9   recognizance, whatever, she was handling my case.
10        They were appalled. They couldn't
11  believe my face and stuff like that. I think I
12  filed a complaint through them, with their
13  assistance. They actually took a lot of these
14  pictures that I have here. They couldn't
15  believe that he had done that to me.
16    Q. So you yourself didn't file the
17  complaint?
18    A. I mean I filed it. I don't know if I
19  filed it through somebody. I lodged the
20  complaint against him.
21    Q. Did you write out a complaint?

150

1     A. I don't know. I know that I -- I know
2   that I made a complaint against them.
3     Q. Okay. I'm asking you. You say you know
4   you made a complaint, I'm asking you how you made
5   the complaint?
6     A. That I don't recall.
7     Q. Do you know if it was an oral complaint,
8   a written complaint?
9     A. It was a written complaint. I don't --
10    Q. Did you write out a complaint?
11    A. That sounds about right. I mean, how
12  else would you complain?
13    Q. I'm asking you. I don't have a copy of
14  your complaint, do you?
15    A. No, I don't have one.
16    Q. Okay. And what I'm trying to understand
17  is, you said you were working with a public
18  defender. Did someone from the Public Defender's
19  Office write out a complaint and submit it to the
20  3rd District on your behalf?
21    A. That's a good possibility. I mean I

151

1   don't know if I wrote it and they just, you know,
2   filed it for me or if I filed it myself. I'm
3   sure -- you know, there was paperwork involved.
4   I don't -- I don't recall the forms or if there
5   is a form or the number of the form, if there is
6   a form for that or, you know, the manner in which
7   it was filed. I know that there was a formal
8   complaint file against him.
9     Q. You can't say for sure whether you
10  actually wrote it out yourself?
11    A. I'm su -- I mean, how else would it get
12  written? I'm sure --
13    Q. That's what I asking. Because you're --
14  you're telling me you don't remember if you
15  actually wrote something out or if someone wrote
16  something out for you?
17    A. No one would have written it for me.
18  Because it was by my own -- by my own -- you
19  know, it was my intent to file a complaint, I'm
20  sure I wrote it.
21    Q. So you wrote the complaint, but you

152

1   don't know how it got submitted?
2     A. However these things get submitted. I
3   don't -- I don't know the --
4     Q. Well, did you walk down to the 3rd
5   District and submit a complaint?
6     A. I don't remember.
7     Q. Okay. Do you remember going into the
8   Public Defender's Office and writing out and
9   signing a complaint?
10    A. I remember at the time I was very close
11  with the Public Defender's Office, and they were
12  taking affidavits and stuff in regards to this.
13  And, you know, they were very helpful. And they
14  helped me file things and took pictures and
15  helped me get done what I needed to get done in
16  time. And actually supplied all the -- all the
17  documents or most of the documents that I have
18  for you. They -- they retrieved them for me.
19  And made sure that I had everything in regards to
20  this case.
21    Q. And so all documents that you've gotten

38 (Pages 149 to 152)

DEPOSITION OF HOWARD TAFLER
Conducted on May 21, 2007

153

1  from the Public Defender you've handed over to
2  your lawyer?
3      A. Yeah.
4      Q. Okay. Do you recall whether there was a
5  copy of the complaint that you filed against
6  Officer Hector within those documents?
7      A. I don't recall.
8      Q. Okay. Is there anything that you can
9  think of that -- for you to verify that you filed
10 this complaint other than what's your own
11 testimony?
12     A. Is there anything that what?
13     Q. Anything, aside from your own testimony,
14 to verify that you filed this complaint?
15     A. The fact that he threatened me because I
16 filed the complaint. I think that's proof to me
17 that it was filed. Because, you know, I guess he
18 heard about it or something. I guess he wasn't
19 disciplined, because he was still wearing his
20 uniform.
21     Q. Were you ever contacted by the Office of

154

1  Police Complaints regarding your complaint?
2      A. I don't think so.
3      Q. There was --
4      A. I don't think I ever heard anything
5  about it. I filed it and never heard nothing
6  about it. Just like, boom, bye, it never
7  happened.
8      Q. What address did you put on the
9  complaint?
10     A. It was five years ago, I don't remember.
11     Q. Is it possible that you put down an
12 address that you were no longer living at?
13     A. No.
14     Q. No? No, that's not possible?
15     A. Very doubtful.
16     Q. But you had moved a few times since the
17 incident, correct?
18     A. I had moved once, and I think -- I think
19 there was a forwarding address.
20     Q. Okay.
21     (Break taken.)

155

1      BY MS. FROST:
2      Q. Since the time that you saw officer
3  Hector on the street, on Euclid Street, did you
4  see Officer Hector any time thereafter?
5      A. No.
6      Q. And did you see Officer Hector any time
7  between the time of your arrest and the time that
8  you saw him on Euclid Street, that you know of?
9      A. I mean I -- I can't quite say that I
10 didn't see him. Okay. Let me go back and
11 restate this. I was very paranoid about him and
12 I had overwhel -- overwhelming fears that he was
13 like around me and lurking around the corner.
14 And I would hear him, you know.
15     Q. But did you actually see him at any
16 time?
17     A. The night that I fell off the roof I
18 thought I saw him.
19     Q. And we are going to get to that. But
20 I'm talking about the time between your arrest on
21 August 4th, 2002 and the time that you saw him,

156

1  two to three months later, on Euclid Street. Did
2  you see Officer Hector at any time?
3      A. I didn't see him.
4      Q. I'm sorry?
5      A. I did not see him.
6      Q. Okay.
7      A. I felt his presence, though.
8      Q. When you say you felt his presence, what
9  do you mean?
10     A. He put the fear in me, you know. I was
11 always looking over my shoulder.
12     Q. But he wasn't actually there?
13     A. No. But, you know, whatever he did
14 worked. You know, he wanted me to fear him and
15 I -- and I feared him. I was always looking over
16 my shoulder, thinking that he was there. And,
17 you know, it's -- it's -- you know, it's one
18 thing to have like somebody who wants to beat you
19 up, but it's another one when the person who
20 wants to beat you up has a badge and a gun. You
21 know, it's a whole another story.

39 (Pages 153 to 156)