MGB Reporting, Inc.

Page 1

1        UNITED STATES DISTRICT COURT

2        FOR THE DISTRICT OF COLUMBIA

3              Civil Division

4

5   HOWARD TAFLER,

6           Plaintiff

7   vs.                           Civil Action No.:05CV01563(PLF)

8   THE DISTRICT OF COLUMBIA,

9   et al.,

10          Defendants

11   _____/

12

13          The deposition of ANTHONY HECTOR was held

14   on Wednesday, May 30, 2007, commencing at 9:26 a.m., at

15   the Iweanoge Law Firm, 1026 Monroe Street NE, Washington,

16   DC, before Kim Brantley, Notary Public.

17

18

19

20

21

22   Reported by: Kimberly Brantley

**CONDENSED**

Page 10

1   A.  Let me see.  Midyear of 2005.
2   Q.  So you moved from here to Ride On?
3   A.  Yes.
4   Q.  So you are no longer employed with the
5   other place?
6   A.  No.
7   Q.  With Ride On, what do you do?  You
8   operate what?
9   A.  I just drive a transit bus.
10  Q.  What usually is your schedule?
11  A.  What do you mean?
12  Q.  I mean, what time do you have to be at
13  work and what time do you get out?
14  A.  3:30 till 12:30.
15  Q.  3:30 in the afternoon or the morning?
16  A.  Yes, afternoon, 12:30 at night, in the
17  a.m.
18  Q.  Prior to the place at Dulles, where
19  were you employed?
20  A.  Metropolitan Police Department.
21  Q.  When did you start your employment at
22  MPD?

Page 11

1   A.  1997.
2   Q.  Around what time of the year?
3   A.  August.
4   Q.  August.  So when did you stop working
5   for MPD?  Was that before you went to Dulles
6   Airport shuttle place?  I mean, from 1997 did you
7   hold any other --
8   A.  No.
9   Q.  So you worked from '97 to --
10  A.  2005.
11  Q.  About 2005.  While you were employed at
12  MPD, what kind of job were you doing for MPD?
13  A.  I worked in patrol, and I was assigned
14  to the Third District.  I worked in vice.  I
15  worked in the Latino Gang Unit.
16  Q.  You did this the whole time you were
17  employed there or at different times?
18  A.  Different stages.
19  Q.  While you were employed with MPD, about
20  how many arrests would you say you've done?
21  A.  I couldn't give you a number.
22  Q.  Hundreds, thousands?

Page 12

1   A.  In the hundreds.
2   Q.  Ten --
3   A.  In the hundreds.
4   Q.  And do you know Howard Tafler, the
5   plaintiff in this case?
6   A.  I know him from locking him up.
7   Q.  And that would be the lockup from
8   August 4th of 2002?
9   A.  Yes.
10  Q.  And why was he locked up?
11  A.  He was locked up for -- it was attempt
12  1 and destruction of property, domestic violence.
13  Q.  How did you come about knowing of
14  the -- of these charges -- I mean, okay, just give
15  me the rundown of what happened, how he got
16  arrested.
17  A.  Which question do you want me to answer
18  first, how I came about the charges or the
19  rundown?
20  Q.  Just tell me more or less the event of
21  August 1st, 2002.
22  A.  I believe I assisted with a call for

Page 13

1   the location in the 1700 block of U Street.  I was
2   working plainclothes, Tac that night.  I remember
3   being in the rear of the location, so I drove
4   around to the back to see a male who matched the
5   description that I got over the radio and the call
6   that I received was he was leaving from behind the
7   building.  He was in the alley at this point,
8   running towards 18th Street.
9   Q.  That's the person was running towards
10  18th Street?
11  A.  Yes.
12  Q.  At this time had the person seen you or
13  did you just observe the person run?
14  A.  As I pulled up -- I don't know when he
15  saw me, but at some point he did and came from the
16  back of the building and then proceeded down the
17  alley to 18th Street.
18  Q.  Maybe I should give you this: I'm
19  trying to understand, I mean, where the house was
20  and where you were when you pulled up.  So you
21  said it was the back of the 1700 block.
22  A.  Yes, I don't remember the location, the

Page 14

1  exact location. But as I pulled in the alley,
2  there was about, give or take, fifty, sixty feet,
3  as he came from behind the building and started
4  running.
5      Q.  So you don't remember it actually, to
6  draw it for me, a layout so it would be easier for
7  me to understand and to ask you questions as to --
8      A.  Um.
9          (Witness complies with counsel's
10 request.)
11     A.  This would be the south alley of
12 Florida (indicating). Let me say this is going to
13 be a building. I approached heading westbound
14 through the alley in the vehicle. So I'm going to
15 say about right there (indicating). As the
16 individual who later I found to be Mr. Tafler came
17 out and started heading westbound, running
18 westbound towards 18th Street, this was going to
19 be 18th Street.
20     Q.  Okay, how long had you been here before
21 you started running? Did you just pull in or were
22 you there for maybe a minute, thirty seconds?

Page 15

1      A.  It was seconds, as I was approaching
2  and he came out and began to run.
3      Q.  Okay, so your car was still moving and
4  not stationary?
5      A.  It was still moving.
6      Q.  And what happened when he started
7  running?
8      A.  He started running, then I pulled up
9  just a little bit closer and got out of my vehicle
10 and chased behind him (indicating). As he was
11 getting down, I'll say midway before he got to
12 18th Street, he tripped and fell. I caught up to
13 him, cuffed him, sat him there. By that time the
14 other officers had got around to the scene. I
15 left him with the officer to go take a look at the
16 back of the building.
17     Q.  Prior to cuffing him, did you ask him
18 any questions or --
19     A.  No.
20     Q.  So you just cuffed him when you got
21 him. Do you know if he was injured after he fell?
22     A.  No, at that time I didn't know that he

Page 16

1  was injured. I just cuffed him and sat him on the
2  side or something.
3      Q.  Okay, so after you cuffed him, you sat
4  him --
5      A.  No, I didn't sit him up. I wouldn't
6  sit him up. I just kind of had him on his side.
7  I sat him up later.
8      Q.  Later before or after you came back to
9  check the property?
10     A.  Actually after I came back he was
11 already sitting up, so either one or the other
12 officers sat up or he sat up on his own.
13     Q.  But at that time you left him where he
14 was, was he lying face down?
15     A.  He was on his side.
16     Q.  On his side?
17     A.  Yes.
18     Q.  But could you see his face?
19     A.  I didn't even pay attention to his
20 face. I patted him, swept his body with my right
21 hand, left hand and then left him like that.
22 There was no weapons. As I said, other officers

Page 17

1  were on the scene, so it was safe enough for me to
2  leave him there and I went and checked out the
3  building.
4      Q.  After checking out the building, what
5  happened next?
6      A.  After I came back, Officer Grajales,
7  who was there with the young lady, we conducted a
8  show-up. Grajales and I talked for a minute and
9  then he was placed under arrest for the charges I
10 stated earlier.
11     Q.  Who was the complainant that --
12     A.  I don't remember her name.
13     Q.  But was she at the scene when you came
14 there?
15     A.  She was with Officer Grajales.
16     Q.  Okay, so when did she come? After he
17 was cuffed, after you came back from going back
18 into the building?
19     A.  When I came back in the building
20 Grajales and her were already there.
21     Q.  Okay, they were already there. And
22 what happened afterwards when you got back there?

Page 18

1  A. What do you mean?
2  Q. I mean, when you got back there, did
3  you discuss with --
4  A. Yes, I stated that I talked to Officer
5  Grajales and then made a determination -- we did a
6  show-up and then Mr. Tafler was placed under
7  arrest.
8  Q. And then you left --
9  A. Then he was transported to 3D by a
10 marked unit that had a cage in it.
11 Q. Do you know the name of the officer who
12 was responsible for the transport?
13 A. Really I don't. If I am thinking
14 correctly, it probably was Officer Anderson.
15 Q. After he was there, while he was
16 transported and did you leave before that?
17 A. I'm sorry, repeat your question.
18 Q. I'm sorry, were you there when he was
19 transported by Officer Anderson or --
20 A. Yes, I was there.
21 Q. So about what time did you leave from
22 the scene?

Page 19

1  A. What time?
2  Q. Yes, I mean what time after he was
3  transported? Do you remember?
4  A. No, I don't.
5  Q. Did you have any further conversation
6  with Miss Andrews, the complainant? Did you have
7  any conversations with her after he was
8  transported?
9  A. No, I don't believe I did. I didn't
10 talk to her, and that was Officer Grajales.
11 Q. So you didn't have any kind of
12 conversations with her?
13 A. I don't think so.
14 Q. Okay, but you were the arresting
15 officer?
16 A. Yes.
17 Q. And you were required to write a report
18 for the arrest, right?
19 A. Filled out a 163, yes.
20 Q. Okay, did there come another time after
21 August 4th of 2002 that you ran into Mr. Thompson?
22 A. No.

Page 20

1  Q. So you never met him after that?
2  A. No.
3  Q. There wasn't another that you had any
4  kind of contact with him?
5  A. No.
6  Q. Did you discuss any other officers
7  after that incident, did you have any conversation
8  with anybody about Mr. Tafler?
9  A. No.
10 Q. You don't remember seeing Mr. Tafler a
11 few weeks afterwards on Euclid Street?
12 A. No.
13 Q. Approximately about how long was it
14 between the time you got arrested and when he was
15 transported?
16 A. Maybe thirty minutes, forty-five
17 minutes. I'm not sure.
18 Q. Do you know if he was transported
19 straight to the precinct or if he was taken to the
20 hospital?
21 A. He was taken to the Third District.
22 Q. But at the time he got back to where he

Page 21

1  was arrested, after checking out the house, did
2  you notice that he was injured or bleeding?
3  A. No.
4  Q. So he wasn't bleeding at any time while
5  you were there?
6  A. I don't recall. I don't believe he was
7  bleeding at the time I -- while we were dealing
8  with everything in the alley, no.
9  Q. Did you hear anything afterwards from
10 Mr. Anderson that he might have injured himself
11 while in transport?
12 A. No, I didn't, nor did I ask.
13     MR. IWEANOGE: Can we take just five
14 minutes.
15     (Brief recess taken.)
16 BY MR. IWEANOGE:
17 Q. So you said you did not notice any
18 injuries to Mr. Tafler at the time of his arrest?
19 A. No, not until I got back to the
20 district.
21     (Form 313 was marked Deposition Hector
22 Exhibit Number 1, for identification.)

Page 22

1  BY MR. IWEANOGE:
2  Q. I just handed you what's marked as
3  Exhibit 1. What is that document?
4  A. This is an MPD form 313.
5  Q. What is that form used for?
6  A. It's an injury form for the arrested
7  person to go to the hospital.
8  Q. Okay. Does it say anywhere on that
9  document that Mr. Tafler was injured?
10 A. It says "Chin is scraped, laceration to
11 the chin, nose due to fall, when attempting to
12 flee from police."
13 Q. So, do you have any recollection now
14 whether he was injured?
15 A. At that time, I didn't know he was
16 injured when I placed him under arrest. I don't
17 recall noticing any blood or anything like that.
18 Q. Did you take any pictures or did anyone
19 take any pictures at the scene?
20 A. I don't think so.
21 Q. Did anyone take any picture of the
22 apartment where the alleged burglary was supposed

Page 23

1  to be happening?
2  A. I don't recall. I don't know.
3  Q. So the only thing you did was show up
4  at the scene, arrest Mr. Tafler and then you left?
5  A. Pretty much. That's right.
6  Q. Okay. So that's a good summary of the
7  role you played in that --
8  A. The role? I took the case and I
9  prepared this 313 for him to go to the hospital.
10 Q. You prepared that document?
11 A. Yes, I did.
12 Q. At the time you were coming to the
13 apartment, I guess you received like a radio run
14 or something?
15 A. Radio run wasn't mine. It was for
16 Officer Grajales, but I assisted him. I was in
17 the area, so I assisted him.
18 Q. And then do you know whether Miss
19 Andrews has stated that Mr. Tafler was still at
20 the location?
21 A. Do I know what?
22 Q. Do you remember, you know, from the

Page 24

1  radio run or whatever officer -- well, I don't
2  know how to say his name.
3  A. Grajales.
4  Q. I just call him Grajales, but I guess
5  that's the wrong way to say it. I mean, did you
6  hear on the radio run that Mr. Tafler was still at
7  the scene when you were coming in?
8  A. That I don't recall.
9  Q. And while Mr. Tafler was, well I guess
10 in your words, fleeing from the residence, did you
11 at any time ask him to stop, or what did you do?
12 Did you just chase him down the alley until he
13 fell, or what happened?
14 A. My procedure is to say, "Stop, police,"
15 so I'm pretty sure I said it just as I took off
16 and started running behind him.
17 Q. But you don't remember exactly if you
18 did or not?
19 A. I'm pretty sure I did.
20 Q. Do you know around when you might have
21 said it? Was it before -- let me ask you this:
22 You said he was already running, then you pulled

Page 25

1  over and you started chasing him?
2  A. Where is the question at?
3  Q. No, I'm just trying to make sure, to
4  make sure I get the facts right. Based on what I
5  recollect, from what you said, that he came out
6  and started running and then you pulled over
7  somewhere close to this place (indicating), and
8  then you started running after him?
9  A. Right.
10 Q. So about how far would you say he had
11 gone before you got out of your car?
12 A. Before I got out of the car?
13 Q. Yes.
14 A. That's hard to say. Probably about
15 twenty-five, thirty feet, maybe.
16 Q. So you don't recollect when you might
17 have said "Stop, police"?
18 A. When I got out of the car and started
19 chasing him, I said it probably then. I wouldn't
20 say it in the car.
21 Q. Okay, I'm not saying you said it -- I'm
22 just asking you when you said it. You said you

Page 26

1  had on plainclothes?
2   A.  Yes.
3   Q.  What kind of clothes did you have on?
4   A.  Just some plain clothes. It was not a
5  police uniform. I'm not sure what I was wearing
6  that night.
7   Q.  You're not sure what you were wearing?
8   A.  No.
9   Q.  Was it a shirt, long-sleeved shirt,
10 short-sleeved shirt, T-shirt?
11  A.  I can't. I don't know what I was
12 wearing that night.
13  Q.  During or after your arrest of Mr.
14 Tafler, did you hear him say anything?
15  A.  No, I don't recall him saying anything.
16     MS. FROST: Can we go off the record a
17 second.
18     (Discussion off the record.)
19 BY MR. IWEANOGE:
20  Q.  At the time you prepared that report,
21 did you ask Mr. Tafler any questions about what
22 happened to him or how he got --

Page 27

1   A.  I didn't ask him. I think the sergeant
2  that signed it asked him something.
3   Q.  But your recollection, the
4  reason -- the only thing you saw or you observed
5  was him falling while fleeing from you?
6   A.  Yes. Just as I caught up to him he
7  fell.
8   Q.  Just as you caught up to him he fell?
9   A.  Um-hum.
10  Q.  Was it a tarred road or was it --
11  A.  No, the alley is brick.
12  Q.  Brick, okay. Do you know if he tripped
13 on anything? Was anything obstructing his way?
14  A.  I don't recall if anything was in the
15 alley or not.
16  Q.  You said you have done hundreds or
17 thousands of arrests --
18  A.  I didn't say thousands.
19  Q.  Okay, hundreds of arrests. I'm
20 assuming from '97 to 2005, that's a long time,
21 somewhere close to that. Let's say hundreds.
22 During all those hundreds of arrests have you had

Page 28

1  any situations where somebody got injured?
2   A.  Yes.
3      MS. FROST: Objection; relevance. You
4  can answer.
5  BY MR. IWEANOGE:
6   Q.  Have you had any situation where
7  someone got injured while you were trying to
8  arrest the person, I mean in close proximity
9  between you and the --
10     MS. FROST: Objection, vague,
11 relevance, and I'll just put a continuing
12 objection as to any injuries for previous arrests.
13 BY MR. IWEANOGE:
14  Q.  You can answer.
15  A.  Yes, I'm pretty sure I have, but I
16 don't recall how many of them, what the
17 circumstances were.
18  Q.  You stopped working for the police
19 department in 2005, right?
20  A.  Right.
21  Q.  What was the circumstances? Why did
22 you stop working for them?

Page 29

1      MS. FROST: Objection; relevance. You
2  can answer.
3      THE WITNESS: I had a trial board from
4  a complaint that came back and during this trial
5  board I received sixty days from the members of
6  the trial board, but it was overturned for
7  termination by the assistant chief of police.
8  BY MR. IWEANOGE:
9   Q.  What was the basis of the complaint?
10 What was the premise?
11     MS. FROST: And I'll object to this
12 line of questioning regarding Mr. Hector's
13 termination.
14     THE WITNESS: Some guys said that I
15 caught them urinating in public and that I made
16 them clean up the urine with their clothes, put
17 their clothes back on, and one guy said that I
18 harassed him, beat him up. Yes, and that's about
19 it.
20 BY MR. IWEANOGE:
21  Q.  And has that been the only complaint
22 that anybody's filed against you?

Page 30

1    MS. FROST: Objection to any questions
2 regarding other complaints. You can answer.
3    THE WITNESS: No. I have had other
4 complaints in the past.
5 BY MR. IWEANOGE:
6    Q. About how many? Can you give me an
7 estimate?
8    A. Probably about seven or eight.
9    Q. What was the disposition of those
10 complaints, if you remember?
11   A. You know, all of them were unfounded.
12   Q. All those other ones were unfounded?
13   A. Yes.
14   Q. So the other one that you had any
15 findings on was the last one?
16   A. Yes.
17   Q. When did that one happen? 2005 or
18 before 2005?
19   A. It was before 2005. It was in 2003.
20   Q. And was any case filed against you
21 based on that incident by the complainant?
22   A. No, I don't think so.

Page 31

1    Q. Have you been a defendant in any other
2 lawsuit in your job as a police officer?
3    A. Yes.
4    Q. How many?
5    A. One.
6    Q. Do you remember the case name?
7    A. I think Sampy was his name.
8    Q. Sampy?
9    A. Right.
10   Q. Do you happen to remember the case
11 number by any chance?
12   A. You're stretching it there, aren't you?
13   Q. Well, you know, some things you may
14 remember and others you may not. It depends.
15      Okay, in what court was this suit
16 filed?
17   A. He didn't get some property back from
18 the department, so, I think it was some money or
19 something, so he sued, and since I locked him up I
20 was under suit.
21   Q. Where was the case filed?
22   A. Where?

Page 32

1    Q. Yes. Was it in superior court or
2 federal court?
3    A. That I don't know.
4    Q. What was the outcome of the case? Did
5 you have to go to trial or was it settled?
6    A. I didn't go to trial, so I guess it was
7 settled.
8    Q. Okay. So you don't know what happened?
9    A. Well, it's over. That's all I know.
10   Q. You didn't have to pay any money out or
11 did anything?
12   A. No, I did not.
13   Q. So was DC a defendant in that case as
14 well with you?
15   A. Yes.
16   Q. Prior to that 2005 incident, have you
17 ever been --
18   A. What 2005 incident?
19   Q. No, I'm talking about the --
20   A. The one with Sampy?
21   Q. No, not Sampy. The one you said went
22 to the --

Page 33

1    A. Trial board.
2    Q. The trial board, yes.
3    A. Okay.
4    Q. Prior to that incident, have you ever
5 been suspended?
6    A. Suspended, yes.
7    Q. Okay. How many times?
8    A. Once.
9    Q. For how long?
10   A. Five days.
11   Q. What was the reason for the suspension?
12   A. Mishandling of property.
13   Q. Besides suspension, I don't know how it
14 works with the police, do they give reprimands,
15 warnings and things like that?
16   A. Yes.
17   Q. Have you ever been reprimanded?
18   A. Yes.
19   Q. How many times?
20   A. Probably two -- well, no. Let's see.
21 An official reprimand, twice.
22   Q. Twice?

Page 34

1    A.  Yes.
2    Q.  **And what was the reason for the first**
3 **one?**
4    A.  One was for I believe a court no show,
5 or didn't go to the clinic, something like that.
6 And the second one was for -- I took a guy's car
7 and I didn't put it on the book. So I got an
8 official reprimand for that.
9    Q.  **What about warnings?**
10   A.  I didn't get none.
11   Q.  **You don't get any warnings?**
12   A.  We don't get warnings.
13   Q.  **What else do you get?**
14   A.  A 750.
15   Q.  **A 750?**
16   A.  Yes. It's something that stays on your
17 jacket.
18   Q.  **What's a 750?**
19   A.  It stays on your jacket for two years,
20 I believe.
21   Q.  **Did you get any 750s?**
22   A.  Yes.

Page 35

1    Q.  **About how many?**
2    A.  Maybe about four or five, maybe more,
3 maybe less. I'm not sure.
4    Q.  **Do you remember the basis for --**
5    A.  They were also for, like, court no
6 shows, when I didn't go to traffic court or
7 something like that.
8    Q.  **So the 2005 incident, I'm not talking**
9 **about the incident, and when I say the "incident,"**
10 **I'm talking about the one that went to the trial**
11 **board, after the process where you were terminated**
12 **or you resigned -- were you terminated after the**
13 **trial board incident, or you resigned?**
14   A.  The trial board gave me sixty days. I
15 was terminated by the assistant chief.
16   Q.  **Okay. A sixty-day suspension?**
17   A.  Yes.
18   Q.  **Do you know why the assistant chief**
19 **terminated you instead of maybe going with the**
20 **recommendation of the trial board?**
21      MS. FROST: Objection. Based on his
22 knowledge, he can answer.

Page 36

1      THE WITNESS: I have no idea what was
2 going on at that particular time. A lot of
3 officers lost their job that same way.
4 BY MR. IWEANOGE:
5    Q.  **I'm trying to understand how arrest**
6 **works, because I read a few things about it, but**
7 **it gets confusing sometimes. So take me down the**
8 **way the process of getting somebody arrested goes.**
9 **After, say, you get a radio run -- well, I'll call**
10 **him Officer G. After he got the run and you were**
11 **there to assist him, what happened in terms of how**
12 **to get somebody arrested? I'm talking about the**
13 **general proceeding.**
14      MS. FROST: Objection; form. You can
15 answer.
16      THE WITNESS: If we find in the facts
17 that everything fits that you committed that
18 particular crime, then you get arrested. You get
19 placed in handcuffs, you get transported to the
20 district, paperwork is processed there, a 163,
21 251, 252. If you need to talk to a detective, you
22 talk to a detective. After that you will

Page 37

1 fingerprint, live scan, send down to the Marshal's
2 block.
3    Q.  **Okay, what I was getting at was the**
4 **specifics in terms of whether, say, in a situation**
5 **where somebody is fleeing from the scene of a**
6 **crime, and you are trying to get the person**
7 **arrested. What is the procedure in terms of**
8 **trying to maybe get the person to stop and then**
9 **when the person stops, you know, I mean, what**
10 **happens in terms of, you know, like "Stop, freeze,**
11 **don't move"?**
12   A.  I stated that. I said "Freeze."
13 Beyond "freeze" I chase you and stop you if I can.
14 If I can catch you, it looks good for me. If I
15 can't, it looks good for you.
16   Q.  **Okay, in this particular case, on**
17 **August 4th, 2002, do you have any knowledge that**
18 **Mr. Tafler knew you were coming to the scene?**
19      MS. FROST: Objection; basis of
20 knowledge.
21      THE WITNESS: I don't know if he knew I
22 was coming to the scene, but he probably heard the

Page 38

1  car.
2  BY MR. IWEANOGE:
3      Q. What kind of car were you driving?
4      A. An unmarked Crown Victoria.
5      Q. Unmarked?
6      A. Crown Victoria.
7      Q. So it doesn't have any --
8      A. No stickers or lights on the top or
9  anything like that, but I did have a light in the
10 dash, or on the dash.
11     Q. So for, say, somebody like me who, you
12 know, who is used to just seeing regular police
13 cars, just by seeing it you can't tell immediately
14 it's a police car in that you just glance at it
15 and then move on, there is nothing to show that
16 it's a police vehicle?
17     A. True.
18     Q. While you were with the MPD, did you
19 ever miss maybe a training session or maybe a roll
20 call while you were employed with them?
21     A. You say miss roll call?
22     Q. I said have you ever missed maybe a

Page 39

1  training you were supposed to go to?
2      A. You said roll call also, right?
3      Q. Yes, roll call.
4      A. A lot of times I was late for work and
5  missed roll call. I missed roll call. Training,
6  I doubt it. If I missed training, I had to make
7  it up anyway, so I would say no.
8      Q. So, after you stopped Mr. Tafler, or
9  after he fell, and you came and placed him under
10 arrest, you handcuffed him, and you said you
11 didn't say anything to him. You just went back to
12 the house?
13     A. Did I say anything to him?
14     Q. Yes.
15     A. No, I don't think I said anything to
16 him.
17     Q. So, it's safe to say that you're the
18 only person that had any conversations with him at
19 the scene would be the other officer, Officer
20 Grajales?
21     A. Grajales? I wouldn't say that. I
22 don't know.

Page 40

1      Q. But you don't remember saying anything
2  to him besides maybe asking him to stop, like you
3  said before?
4      A. That's about it.
5      Q. So as you sit there, you have no
6  recollection about how Mr. Tafler got injured?
7      A. I told you when I cuffed him I didn't
8  see any blood or anything like that. I didn't
9  know he was really injured till I got back to the
10 station.
11     Q. But he was taken to the hospital?
12     A. Yes, he was.
13     Q. From the station?
14     A. Yes.
15     Q. What is the process in terms of -- say
16 that somebody's injured while being arrested or
17 injured before arrest, what is the procedure for,
18 you know, giving the person medical assistance?
19     A. If he is going to be arrested, then we
20 fill out this 313 (indicating), which will
21 accompany him to the hospital, and he gets treated
22 and he will be brought back to the district and

Page 41

1  he'll be processed and sent downtown.
2      Q. Under what situations do you take the
3  person to the district first before taking them to
4  the hospital?
5      A. Pretty much all the time, unless he's
6  bleeding that bad and we can't take him to the
7  district. Then we have a sergeant or some
8  official bring a 313 to the scene and we will do
9  it there and send him to the hospital from there.
10     Q. Was any ambulance at the scene on that
11 day?
12     A. I don't recall an ambulance that day.
13     Q. So it was only police officers and the
14 complainant?
15     A. Yes. I would say yes.
16     Q. And about what time of the day was
17 this?
18     A. It was at night.
19     Q. At night. Did the alley have lights?
20 Was it dark out?
21     A. It had a couple of, you know, lights on
22 the pole, high intensity street lights, but they

Page 42

1  weren't every -- what is it, every forty, fifty
2  feet or so. I think it was only maybe one, maybe
3  two in the alley.
4     Q. But you could see behind the alley?
5     A. Hum?
6     Q. But you could see? Like, if somebody
7  was coming, you could see the person?
8     A. You could see, but, you know, if you
9  wanted to get into a very good description, you
10 know, it depends on the lighting of the alley.
11    Q. Yes, but in this situation, I mean,
12 there was enough light for you to identify Mr.
13 Tafler? I said in this situation there was enough
14 light for you to identify Mr. Tafler?
15    A. Yes.
16    Q. So you didn't chase him just because he
17 was running from that location?
18    A. Yes, I was chasing him because he was
19 running from that location, yes.
20    Q. Not because -- that's what I am trying
21 to figure out. I'm trying to figure out, were you
22 chasing him because he was running from the

Page 43

1  location of the call in, or because he matched the
2  description --
3     A. Both, because he matched the
4  description and he was running.
5     Q. Do you have a copy of whatever notice
6  that was given to you when you were terminated
7  from MPD?
8        MS. FROST: Objection.
9        THE WITNESS: Probably not at this
10 point, probably not.
11 BY MR. IWEANOGE:
12    Q. At your current employment,
13 approximately about how much do you earn from that
14 employment?
15       MS. FROST: Objection; relevance.
16       THE WITNESS: Thirty-eight, thirty-nine
17 thousand or something.
18 BY MR. IWEANOGE:
19    Q. How much were you earning at MPD?
20       MS. FROST: Objection, relevance.
21       THE WITNESS: A little more than fifty.
22 BY MR. IWEANOGE:

Page 44

1     Q. Were you ever asked to come to court
2  for the criminal case based on the charges that
3  you filed? I said, did you ever go to court on
4  the charges that you filed as a result of this
5  incident?
6     A. In this case with Mr. Tafler?
7     Q. Yes, in this case.
8     A. No, it was dropped somewhere, so we
9  never made it to trial. I did have court on it,
10 but when I got to court it had been dropped.
11    Q. When you arrested Mr. Tafler, can you
12 describe for me his reaction pretty much? Was he
13 calm? Was he screaming? Was he shouting? Did he
14 say anything that you recollect?
15    A. I have no idea. I do not recall what
16 his reaction was.
17    Q. So then if he was talking, or just
18 comfy laying on his side?
19    A. I don't recall.
20    Q. He was transported in handcuffs?
21    A. Yes.
22    Q. When you got back to 3D, did you have

Page 45

1  any conversation with any officers available,
2  either a superior or supervisor actually regarding
3  Mr. Tafler?
4     A. I don't remember what officer let me
5  know that he was bleeding.
6     Q. It was an officer that told you that he
7  was bleeding?
8     A. Yes.
9     Q. And that he needed to go to the
10 hospital?
11    A. Once I looked at him, yes, he needed to
12 go to the hospital.
13    Q. How was he transported to the hospital?
14    A. In a marked scout car.
15    Q. Do you know who took him?
16    A. No, I don't.
17    Q. But it wasn't you that took him?
18    A. No, it wasn't.
19    Q. In that August of 2002, did you have
20 any partner or you were working alone?
21    A. On that night?
22    Q. Not that night, I mean that period.

Page 46

1  That month?
2     A. Yes, I had partners, you know, on
3  different nights. Yes, I had partners.
4         MR. IWEANOGE: Were you able to get any
5  medical records?
6         MS. FROST: I have a whole stack. We
7  have to figure out what to do with it, if you want
8  to send someone over and they can pick them up
9  there. They're like this (indicating.)
10        MR. IWEANOGE: That's a lot of records.
11        MS. FROST: Most is from Moss Rehab.
12 It's a lot of nurses, temperature, blood pressure,
13 five times a day for three months.
14        MR. IWEANOGE: I just got a
15 confirmation back from George Washington Hospital,
16 but they have to process it. It's probably going
17 to be a lot of records.
18       (Brief recess taken.)
19 BY MR. IWEANOGE:
20    Q. Prior to your arrest of Mr. Tafler, you
21 didn't ask him any questions about what he was
22 doing in the area?

Page 47

1     A. No.
2     Q. You didn't ask him if he lived at the
3  apartment?
4     A. No, I don't think so.
5     Q. It's your recollection that he tripped
6  and fell while he was fleeing from you?
7     A. Yes.
8     Q. Was Officer Grajales anywhere close to
9  the scene when he was running, when Mr. Tafler was
10 running down the alley?
11    A. No, I don't think so.
12    Q. Are there other apartment buildings in
13 this area, or just this one (indicating)?
14    A. There are apartment buildings and
15 houses beside it.
16    Q. Was this like an open area behind a
17 gate or anything, do you remember?
18    A. I'm not a hundred percent sure, but I
19 believe that it had like a little, like, two-foot
20 wall and then it was open and that's where he came
21 out of that.
22    Q. From where he was, could you see where

Page 48

1  the person was coming out from, or was he already
2  on the street where you saw him?
3     A. I saw him come out of that location.
4     Q. And "that location" you're talking
5  about, is it one apartment that you see when you
6  come to the back entrance, or are there two sides
7  or three sides?
8     A. I don't recall.
9     Q. You don't recall.
10    A. No.
11    Q. At no time either prior, during or
12 after the incident did you talk to Jennifer
13 Andrews? That's the complainant.
14    A. She was there with Officer Grajales.
15 On the scene I think at best I said to her was it
16 a positive or negative on the show-up
17 (indicating).
18        (A hand-drawn diagram was marked
19 Deposition Hector Exhibit Number 2, for identification.)
20 BY MR. IWEANOGE:
21    Q. Do you know the person that wrote this?
22        MS. FROST: For the record, Mr.

Page 49

1  Iweanoge is pointing to the section of the PD 313
2  that has report of injury on this of arrestee.
3         THE WITNESS: I did.
4  BY MR. IWEANOGE:
5     Q. You wrote that part?
6     A. I wrote that part.
7     Q. What about this other part? For the
8  record, I'm showing the part that says "Arrestee's
9  account of incident." Who wrote that part?
10    A. Probably an official.
11    Q. Can you read that part, just for the
12 record?
13    A. It said, "I was tackled by the police
14 and scraped my chin on the cement."
15        You want me to read the other part from
16 what I wrote?
17    Q. Yes.
18    A. The part where it has "Report of injury
19 or illness of arrestee," I wrote, "Laceration to
20 chin and nose due to fall when attempting to flee
21 from police."
22    Q. And the signature is there for the